# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## FEBRUARY 2000 SESSION

FILED

March 20, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | **No. E1999-01287-CCA-R3-CD** |
| Appellee, | ) | |
| | ) | **MONROE COUNTY** |
| VS. | ) | |
| | ) | **HON. CAROLL L. ROSS,** |
| JERRY ALLEN MILLSAPS, | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (First Degree Murder: |
| | ) | Life Without Parole) |

FOR THE APPELLANT:

**CHARLES M. CORN**
District Public Defender
53-A Central Ave.
P.O. Box 1453
Cleveland, TN 37364-1453

FOR THE APPELLEE:

**PAUL G. SUMMERS**
Attorney General and Reporter

**LUCIAN D. GEISE**
Assistant Attorney General
Cordell Hull Building, 2nd Floor
425 Fifth Avenue North
Nashville, TN 37243-0493

**JERRY N. ESTES**
District Attorney General

**WILLIAM W. REEDY**
Assistant District Attorney General
130 Washington Ave. NE
P.O. Box 647
Athens, TN 37371-0647

OPINION FILED: _____

AFFIRMED

**JOE G. RILEY, JUDGE**

**OPINION**

Defendant was convicted by a Monroe County jury of premeditated first degree murder and sentenced to life without the possibility of parole. In this appeal as of right, defendant makes the following allegations:

(1) The evidence is insufficient to support his conviction;

(2) The trial court erroneously limited cross-examination regarding the victim's family's and employee's reputation for violence.;

(3) The trial court erred by failing to appoint a disinterested interpreter and by limiting cross-examination into the credibility of the court-appointed interpreter; and

(4) The evidence was insufficient to establish the heinous, atrocious, and cruel aggravating circumstance.

Upon careful consideration of the record presented for review, we **AFFIRM** the judgment of the trial court.

**I. FACTS**

The defendant was a bartender at the Log Barn Bar in Monroe County, and the victim was a regular patron at the Bar. Testimony at trial revealed the two had a continued history of animosity. Testimony from the state's witnesses revealed that prior to the night of the murder, the victim and the defendant argued over the victim's accusations that defendant was providing marijuana to one of the victim's employees and that defendant had stolen money from a patron at the bar.

Bill Barr, a patron of the Log Barn, described an incident three weeks before the homicide in which the defendant attempted to shake the victim's hand and the victim refused, stating "I won't shake hands with no son of a bitch that hollers and shouts at me." Barr also testified that on January 21, 1997, the night of the murder, defendant indicated he was "about over this shit," referring to the victim and his

2

family. Fifteen minutes after this statement, defendant purchased a pistol from Barr.

Shortly thereafter, defendant and the victim entered into a verbal altercation in which the defendant accused the victim of trying to "start shit." The defendant knocked the victim to the floor and began choking him. Barr testified that the defendant "had his knees in the victim's shoulder blades, choking him with both hands," and the victim was unable to move or defend himself. Barr then attempted to extricate the defendant from the victim, stating "please, don't kill him." The defendant told him to "get the hell out." Barr started to leave and the defendant's wife begged him to stay, asking him "what am I going to do?". Barr left the establishment, responding "I don't give a damn what you do; I'm leaving."

Defendant testified that after Barr left, there was a lull in the fighting. He claims he left the room and, upon his return, noticed the victim had a knife. A subsequent altercation ensued during which the victim was thrown against the brick floor and strangled until he ceased movement.[1] Upon realizing the victim was dead, the defendant shut off the lights in the bar, locked the doors and drug the victim's body into an adjoining room.

The defendant showered and changed his clothes. He placed his clothes and the victim's personal items into the wood burning stove, moved the body to the outside of the building, and covered it with garbage bags. He then went to bed. The next morning defendant moved the victim's vehicle from the bar parking lot to the main road. He then transported the victim's body to his mother's property and buried it underneath an abandoned outhouse. The body was found approximately two weeks later.

---

[1]The state medical examiner testified that the victim could have died either from strangulation, blunt trauma to the head, cranial hemorrhaging, or a combination of all three. He explained to the jury that the victim had approximately twelve times the hemorrhaging required to cause death.

Steve Dotson testified that the day after the murder the defendant stated that the "troubles at the Log Barn are over...[h]e's cut up and burnt and they'll never find the body." In addition Barr testified that later that day defendant asked him to tell authorities that he was the last one to leave the Log Barn on the night of the murder.

Soon after the victim's disappearance and prior to finding his body, defendant was interviewed by law enforcement authorities. He gave two separate written statements. In the first statement, he said there was no altercation at the bar; the victim left the bar; and he never returned. In the second statement defendant said he had a "fight" with the victim; the victim left the bar; and the victim never returned. At no time did the defendant ever mention that the victim had a knife.

Defendant was found guilty of first degree murder and sentenced to life in prison without the possibility of parole.

## II.  SUFFICIENCY OF THE EVIDENCE

Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

Defendant claims there is insufficient evidence to prove the victim's death resulted from a "premeditated and intentional killing." *See* Tenn. Code Ann. § 39-13-202(a)(1). He argues the altercation arose from an invitation to mutual combat, and the murder occurred in the excitement of that combat. Thus, he contends the evidence only supports a conviction for voluntary manslaughter. *See* Hunt v. State, 303 S.W.2d 740, 742 (Tenn. 1957).

The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992)(citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." *Id.* A homicide, once proven, is presumed to be second degree murder, and the state has the burden of proving premeditation to raise the offense to first degree murder. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our Supreme Court delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of the intent to kill the victim by the defendant, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *See* Bland, 958 S.W.2d at 660.

The evidence revealed a continued animosity between the defendant and the victim. Bill Barr, a regular patron at the Log Barn, testified that on the night of the murder the defendant told him that he "was about over this shit," referring to the victim and his family. Fifteen minutes later, he asked Barr if he could purchase his pistol and Barr complied. He further testified that the defendant accused the victim of trying to "start shit" and jumped on the victim "for no reason." Barr attempted to extricate the defendant from the victim and said to the defendant "Please stop, don't kill him." The defendant responded by telling Barr to "get the hell out of here." Barr testified that the defendant had the victim pinned down with his knees. He stated that the victim could not defend himself.

A killing committed during a state of passion may rise to the level of first degree murder if the State can prove that premeditation preceded the struggle. State v. Hall, 8 S.W.3d 593, 600 (Tenn. 1999). Furthermore, "it is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). The jury heard sufficient testimony to indicate the defendant was the aggressor in the initial attack, and could reasonably conclude any passion that led to the initial attack was interrupted by Barr's attempt to separate the two as well as Barr's verbal warning not to kill the victim. Based upon the nature and extent of the head trauma as established by the medical proof, the jury could reasonably conclude that the beating continued after Barr's attempt to stop the attack.

Although the defendant testified there was a second altercation in which the victim produced a knife, defendant never mentioned a knife to the investigators. The medical examiner testified that the victim had numerous defensive wounds on his forearms. The number and extent of the blunt trauma wounds to the head also indicate that the defendant continually beat the defenseless victim with an intent to cause death. The victim suffered from twelve times the amount of hemorrhaging

6

necessary to produce death.

Evidence of "repeated blows" is not sufficient, by itself, to establish premeditated murder. State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992). Furthermore, concealment of evidence after the crime is insufficient to establish premeditation. West, 844 S.W.2d at 148. However, calmness immediately after a crime is relevant in determining the element of premeditation. Bland, 958 S.W.2d at 660.

Whether the state established premeditation was primarily a jury question. The jury could believe or disbelieve any or all of the defendant's testimony. It was within their prerogative to reject self-defense, which it did. The jury could reasonably conclude that Barr's intervention was a sufficient interruption to quell any existing passion. The continued beating of a totally defenseless person is also relevant, not only to the issue of self-defense, but also to the defendant's state of mind.

Viewing the evidence in the light most favorable to the state, we conclude that the jury could reasonably infer premeditation from the circumstances surrounding the murder. This issue is without merit.

## III. REPUTATION EVIDENCE

Defendant argues that the trial court erred by not allowing defense counsel to cross-examine witnesses with regard to the victim's family's and employee's reputation for violence. He claims this evidence was necessary to explain why he did not report the crime, but rather attempted to conceal it.

At trial the judge allowed the defendant to testify to this information as it related to the defendant's state of mind at the time of the crime and the events that followed. Defendant testified that he knew Allen Kile, the victim's son, was in the federal penitentiary for murder. In addition, counsel was allowed to ask two of the state's witnesses about certain instances of violence committed by the victim's family and one of the victim's employees. Both witnesses denied having any knowledge that either the victim, his sons or employees had a reputation for committing acts of violence. Furthermore, counsel was allowed to ask the victim's son, Bobby Kile, Jr., and employee, Felicito "Felix" Roblero, about specific instances of violence they allegedly comitted.

The trial court did refuse to allow the defendant to cross-examine the T.B.I. agent in charge of the current investigation with regard to his knowledge of Allen Kiles' conviction. The court held such cross-examination was not necessary since the defendant had already testified about Allen Kiles' conviction and the circumstances surrounding that offense. The trial court further held the agent's involvement in the Kiles case was irrelevant. Although we agree that establishing a basis for defendant's post-homicide actions was relevant, we find no abuses of discretion by the trial court in these rulings.

Furthermore, the defendant indeed presented evidence relating to this issue. Therefore, no prejudice resulted from the limitation placed upon him by the trial court. This issue is without merit.

## IV. COURT-APPOINTED INTERPRETER

At trial, a Hispanic interpreter was appointed to assist in the testimony of the state's witness, Felicito "Felix" Roblero. Roblero was an employee of the victim and

a regular patron at the Log Barn. The interpreter was also an employee of the victim and currently worked for the victim's brother. The interpreter took an oath to make a truthful translation pursuant to Tenn. R. Evid. 604.

### A. Appointment

The defendant argues the trial court erred by failing to appoint a disinterested party as an interpreter. "Appointment of an interpreter of a witness' testimony in a criminal case is a matter for the trial court's discretion subject to reversal only for abuse of that discretion." State v. Van Tran, 864 S.W.2d 465, 475 (Tenn. 1993). A party contending that a translation was inaccurate must prove prejudice, and this court should not speculate as to the accuracy of the translation. *Id.* at 476. The better practice is to appoint a disinterested interpreter. *Id.*

The record is silent as to the circumstances leading up to the appointment of the interpreter, and no objection was made. This issue is waived. Tenn. R. Crim. P. 36(a). Defendant, nevertheless, asserts plain error. *See* Tenn. R. Crim. P. 52(b). However, defendant has not demonstrated nor even alleged the translation was inaccurate and, thus, has not demonstrated prejudice. Van. Tran, 864 S.W.2d at 476.

This issue is without merit.

### B. Impeachment

During the cross-examination of Roblero, defense counsel began questioning

9

the interpreter and established that he worked for the victim for five years and still worked for the victim's brother. A bench conference subsequently ensued where defense counsel advised the trial judge he was "shooting blind," but had been informed by his client that the interpreter "has been in jail some." The trial court refused to allow defense counsel to ask the interpreter if he had been in jail.

The issue of whether an interpreter can be impeached with a prior conviction, pursuant to Tenn. R. Evid. 609, is an issue of first impression in Tennessee. An interpreter is "subject to the provisions of the [Tennessee Rules of Evidence]... relating to... the administration of an oath or affirmation to make a true translation." Tenn. R. Evid. 604. The accuracy of the testimony of the witness as heard and determined by the trial court or jury depends upon the accuracy of the translation or interpretation. If an interpreter's credibility is subject to question, certainly this may be established by an examination of the interpreter. An examination or cross-examination of an interpreter is governed by the Tennessee Rules of Evidence.

Evidence of a prior criminal conviction of a witness may be admitted if it was a felony or if it was a misdemeanor that involved dishonesty or false statement. Tenn. R. Evid. 609 (a)(2). Unfortunately, the record is meager relating to this issue. Defense counsel was admittedly "shooting blind." The record does not establish whether the interpreter had any prior record, although the prosecutor stated during the bench conference that "he had a misdemeanor."

The jury was aware of the interpreter's connection to the victim and his family. Furthermore, the nature of Roblero's testimony related only to a prior confrontation between the victim and the defendant. Most importantly, as noted above, there is absolutely no allegation or indication that the translation was inaccurate. *See* Van Tran, 864 S.W.2d at 476.

10

For these reasons, we conclude the defendant has failed to establish prejudice. Tenn. R. App. P. 36(b). This issue is without merit.

## V. Life Without Parole

Finally, defendant claims the jury erroneously sentenced him to life without the possibility of parole. He argues the evidence does not support the jury's conclusion that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." *See* Tenn. Code Ann. § 39-13-204(i)(5). We disagree.

"The 'especially heinous, atrocious or cruel' aggravating circumstance may be proven under either of two prongs; torture or serious physical abuse." State v. Hall, 8 S.W.3d 593, 601 (Tenn. 1999). "The terms 'serious physical abuse beyond that necessary to produce death are self-explanatory; the abuse must be physical rather than mental in nature." *Id.* "Abuse is defined as an act that is 'excessive' or which makes 'improper use of a thing,' or which uses a thing 'in a manner contrary to the natural or legal rules for its use.'" State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996) (quoting Black's Law Dictionary 11 (6th ed.1990)). In Hall, the Court held that the "extent and severity of the beating supported a finding of either physical torture or "serious physical abuse beyond that necessary to produce death." Hall, 8 S.W.3d at 601.

In the instant case, the medical examiner testified that there was massive brain hemorrhaging, blunt trauma to the head and manual strangulation, any one of which could have caused the victim's death.[2] In addition, the autopsy revealed multiple contusions, lacerations and abrasions to the victim's face, head, and neck.

---

[2]The medical examiner explained to the jury that 5 cc's of hemorrhage can result in death. He further testified that the autopsy of the victim revealed a total of 140 cc's of hemorrhage.

11

He further testified that the victim had defensive wounds on his arms.

We view the sufficiency of the evidence for an aggravating circumstance under the standards of <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); namely, whether, after viewing the evidence in a light most favorable to the state, a rational trier of fact could find the aggravating circumstance beyond a reasonable doubt. *See* <u>State v. Williams</u>, 690 S.W.2d 517, 530 (Tenn. 1985). Considering the nature and extent of the injuries, including the fact that manual strangulation or blunt trauma to the head could have caused death, we conclude the evidence supports the jury's conclusion that the defendant inflicted serious physical abuse beyond that necessary to cause the victim's death. This issue is without merit.

## VI. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the trial court.

_____
**JOE G. RILEY, JUDGE**

**CONCUR:**

_____
**JOSEPH M. TIPTON, JUDGE**

_____

12

**THOMAS T. WOODALL, JUDGE**