# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 11, 2004 Session

## STATE OF TENNESSEE v. LINDA HERRON

**Direct Appeal from the Criminal Court for White County**
**No. CR883     Leon Burns, Jr., Judge**

---

**No. M2003-00759-CCA-R3-CD - Filed December 10, 2004**

---

The appellant, Linda Herron, was convicted by a jury in the White County Criminal Court of second degree murder. The trial court sentenced the appellant to eighteen years incarceration in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence supporting her conviction and the trial court's jury instructions. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

David Brady (on appeal), Joe L. Finley, Jr., (at trial and on appeal), and John B. Nisbett, III, (at trial and on appeal), Cookeville, Tennessee, for the appellant, Linda Herron.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; William E. Gibson, District Attorney General; and William M. Locke and John Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At the appellant's trial, the proof adduced by the State revealed that the appellant and the victim, her husband, Gillis Herron, had a tumultuous relationship. Their twenty-six year marriage was "[r]ough. It was rocky and [marked by] a lot of jealousy, possessiveness, and a lot of fussing, mostly on his part." Several witnesses asserted that the appellant "degrade[d] [the victim] and put him down in front of other people." Additionally, there was conflicting proof at trial regarding the victim's physical abuse of the appellant. Some of the State's witnesses testified that the appellant never appeared bruised, while other State's witnesses stated that they had seen the appellant bruised. Regardless, one of the State's witnesses, Everett Daniels, recalled that, approximately four to six months prior to the offense, the appellant told him, "I'm going to kill that son-of-a-bitch [the victim]. One of these days I'm going to kill him."

At approximately 6:30 p.m. on August 25, 2001, the day of the offense, Jason Herron, the son of the appellant and the victim, and Jason's wife, Jessica, stopped by the appellant's residence.[1] Jason borrowed money from the appellant for cigarettes, and he returned to the residence with change at approximately 8:30 p.m. The appellant came outside wearing only a shirt and underwear. The appellant told Jason and Jessica that the victim was already in bed. Then, she "fussed" with Jason because she wanted Jason to leave his oldest child with her that night. Jason refused because the child had to attend church the next morning. Jason and Jessica left shortly after the conversation with the appellant.

Later that night, at approximately 9:00 p.m., the appellant called her mother, Mary Elizabeth Haston. The appellant told her mother, "Come to me, Mama. And hurry. I've done something stupid." Mary contacted her stepson, Kenneth Eugene Haston, to drive her to the appellant's residence. The Hastons arrived at the appellant's residence twenty to twenty-five minutes after the appellant's call. The appellant came out of the back door of the residence, which door led into the laundry room then to the kitchen.

Kenneth approached the house and saw the victim sprawled on his back on the floor of the laundry room. "[T]here was no response to him. All he was doing was just laying there gurgling." The victim's head was surrounded by a pool of blood. Additionally, Kenneth saw what he believed to be a bullet hole in the victim's head, and he also saw a gun on the washing machine.

Kenneth encouraged the appellant to call 911 emergency services for assistance. Because the appellant did not have a telephone in the house, she and her mother went to a Shell service station that was located one and one-half miles from the appellant's residence. The appellant forewent going to the residence of her next-door neighbor, Officer J.T. King, even though she had used Officer King's telephone in the past. Once they arrived at the service station, the appellant called 911 and asked to speak with Regina Adcock. When the appellant was advised that Adcock was not present, the appellant requested that an ambulance be sent to her home. She stated that someone had been hurt after falling and hitting his head. The 911 call was received at 10:08 p.m.

When emergency medical service (EMS) workers arrived, they found the victim lying in the floor of the laundry room and discovered that he had been shot two to three centimeters above his right ear. A large amount of blood circled the victim's head. From the color, temperature, and coagulation of the blood pool, Michael Scott Selby, one of the EMS workers, estimated that the blood had been present for at least fifteen to thirty minutes.

Michael Selby knew that Officer King was the appellant's next-door neighbor. Accordingly, Selby requested Officer King's presence at the scene, and he also contacted the 911 dispatch office for additional police assistance. Selby noted that the appellant was not hysterical or crying at this

---

[1] Many of the witnesses in the instant case share a surname. Accordingly, for clarity, we will be using the first names of the witnesses. We intend no disrespect to these individuals.

time. Selby did not detect any indication that first aid had been attempted prior to the arrival of EMS. The victim was taken to Erlanger Hospital where he later died.

Police arrived at the residence shortly before EMS left with the victim. During a brief inspection of the house, Officer Tony Copeland with the Sparta Police Department found a gun on the bed in the back bedroom of the house. Officer Copeland recalled that the appellant "was very apologetic. She just kept telling me that it was an accident, that she was sorry."

Allen Selby, an investigator with the Sparta Police Department, arrived at the scene after the victim was taken to the hospital. He stated that he found a loaded revolver in the master bedroom. The gun was an R.G. Industry .22 caliber revolver which was loaded with five live rounds. Additionally, there was evidence that the gun had been loaded with six rounds, but one of the rounds had been fired.

Investigator Roy Gooch photographed the appellant the morning following the incident. The appellant told Investigator Gooch that her face was bruised, but he was unable to detect any bruises on the appellant's face. However, Investigator Gooch did photograph a large, purple bruise on the appellant's right arm.

Dr. Charles Warren Harlan conducted the autopsy of the victim. He stated that the victim was six feet and one inch tall and weighed 208 pounds. Dr. Harlan found that a bullet entered the victim's head three inches below the top of his head. Additionally, Dr. Harlan observed five inches of stippling around the wound, suggesting that the bullet had been fired ten to twelve inches from the victim's head. Moreover, the "bullet traveled straight from right to left. There's no upward or downward deviation. There's no right or left deviation. It just went straight across." The bullet was recovered from the left parietal lobe of the victim's brain. Further, Dr. Harlan noted that there was no indication of alcohol in the victim's blood or urine; however, the fluids did contain trace amounts of methamphetamine. At the conclusion of Dr. Harlan's testimony, the State rested its case-in-chief.

The defense proof was based primarily on the claims of defense witnesses who alleged that the victim frequently physically abused the appellant. The appellant contended that the victim beat her often, but she did not want to leave him because she was afraid of embarrassing the victim's family. Additionally, the appellant opined, "I guess I loved his blood." The appellant stated that the victim's abuse began four to six years prior to the offense, a time which coincided with the start of the victim's methamphetamine usage.

On the day of the offense, the victim and the appellant argued about their son Jason. The victim pushed the appellant into a bedpost, bruising her arm. The appellant decided to leave until the situation cooled. However, the victim followed the appellant into the kitchen, blocking her exit from the back door of the home. The appellant got a drink of water from the kitchen sink, and the victim threw one of his shoes at her. The appellant did not say if she was struck by the shoe.

Afterward, the appellant sat at the kitchen table, and the victim "smacked" her across the face with his other shoe. The victim told her, "You'd better get that gun out [of your purse] and you'd better shoot me because I am going to hurt you." The appellant responded, "I think I will." The appellant then pulled from her purse a gun that the victim's aunt had given him six months prior, which gun the victim insisted the appellant carry in her purse. The appellant turned the gun toward the "pool room" and cocked it, thinking that she would "scare him, to make him, you know, to get him where he wouldn't hurt me." The appellant could not recall if the victim charged her, but she recalled, "I shut my eyes and came around and it just went off." The appellant claimed that she was seated and the victim was standing when the shot was fired. She stated that she heard "the little bang," then saw the victim fall at her feet. She wondered, "What have I done?"

The appellant called her mother, and Mary and Kenneth Haston arrived shortly thereafter. The Hastons urged the appellant to call 911, and she did so. Soon, help arrived.

The appellant stated that she was five feet and two or three inches tall. She could not explain how the bullet traveled straight through the victim's brain if the shooting occurred when she was sitting and the victim was standing. The appellant also could not explain why she called her mother for assistance at 9:00 p.m., but she failed to call for medical assistance until more than one hour later. Further, the appellant could not relate why she did not call for help from Officer King's home. Moreover, when asked why she told 911 that someone had fallen instead of mentioning the gunshot wound, the appellant opined that she must have been "hysterical."

From the foregoing proof, the jury found the appellant guilty of the indicted offense of second degree murder. The trial court sentenced the appellant to eighteen years incarceration. The appellant timely appealed, challenging the sufficiency of the evidence and the correctness of the trial court's instructions to the jury.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are

resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

To sustain the appellant's conviction for second degree murder, the State was required to prove that the appellant knowingly killed the victim. See Tenn. Code Ann. § 39-13-210(a)(1) (2003). Our supreme court has determined that second degree murder is a result of conduct offense. See State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2003). Furthermore, "[a] homicide, once proven, is presumed to be second degree murder." State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000).

In the instant case, the proof adduced at trial, in the light most favorable to the State, established that the appellant and the victim had a contentious relationship. The appellant conceded that she argued with the victim, then shot him. In fact, the appellant stated that when the victim prompted her to shoot him, she responded, "I think I will." Further, the appellant stated four to six months prior to the offense that she would kill the victim one day. Additionally, Dr. Harlan testified that the bullet entered just above the victim's right ear and traveled on a straight trajectory. The proof demonstrated that the victim was six feet and one inch tall, while the appellant was five feet and two or three inches tall. The vast difference in height renders the appellant's version of events, that she was sitting when she shot the standing victim, less than credible. Accordingly, we conclude that the proof was sufficient to establish the appellant's guilt of second degree murder.

We note that the appellant argued at trial that her actions were the result of accident or self-defense. The jury, as was its prerogative, chose not to credit the appellant's theory. We will not second-guess the factual determination of the jury. "As stated above, the [S]tate sufficiently established that the [appellant] committed a homicide, presumptively second-degree murder. . . . [T]he presumption [was not] disturbed by any proof that the offense was a lesser one than second-degree murder." State v. Winters, 137 S.W.3d 641, 656 (Tenn. Crim. App. 2003).

## B. Jury Instructions

The appellant argues that "[t]he trial court improperly instructed the jury that a knowing, second degree murder was either a nature-of-conduct offense or a result-of-conduct offense. The trial court then repeated this error when defining the lesser-included offenses of voluntary manslaughter, reckless homicide and criminally negligent homicide." Specifically, the appellant contends that the "trial court erred by charging the jury with the nature-of-conduct jury instruction in the trial court's definition of 'intentional' in the second degree murder jury instruction." Additionally, the appellant claims that the trial court erred by impermissibly instructing the jury regarding the nature of conduct definitions of recklessly in the reckless homicide instruction and criminal negligence in the criminally negligent homicide instruction.

Tennessee Code Annotated section 39-11-302(a) and (b) (2003) defines the culpable mental states of intentional and knowing as follows:

> (a) "Intentional" refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.
>
> (b) "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

In State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000), our supreme court explained that second degree murder is strictly a result-of-conduct offense. "A result-of-conduct offense requires that the culpable mental state accompany the result as opposed to the nature of the conduct." Id. Therefore, the second degree murder

> statute focuses purely on the result and punishes an actor who knowingly causes another's death. The intent to engage in conduct is not an explicit element of the state's case in second degree murder. Accordingly, a result-of-conduct crime does not require as an element that an actor engage in a specified course of conduct to accomplish the specified result.

Id.

In State v. Page, 81 S.W.3d 781, 785 (Tenn. Crim. App. 2002), the defendant admitted that he struck the victim with a baseball bat; however, the defendant did not intend to cause the victim's death. On appeal, this court reversed Page's conviction for second degree murder because the trial court erroneously instructed the jury as to both the nature of conduct and result of conduct definitions of "knowingly." Id. at 787-88. This court explained that "[a] jury instruction that allows a jury to convict on second degree murder based only upon awareness of the nature of the conduct or circumstances surrounding the conduct improperly lessens the state's burden of proof. For second degree murder, a defendant must be aware that his or her conduct is reasonably certain to cause death." Id. at 788.

In the instant case, it is undisputed that the trial court correctly defined the element of "knowing" for the jury. However, the appellant contends that the trial court erred in including the nature of conduct definition of "intentional" when stating that "[t]he requirement of 'knowingly' is also established if it is shown that the defendant acted intentionally." At the hearing on the

appellant's motion for new trial, the trial court conceded that the definition of intentional was erroneous. After our examination of the record, we agree. Notwithstanding the error, our analysis of this issue is not yet complete.

In Page, this court explained that "an erroneous jury instruction, which misstates the applicable conduct element of an offense and lessens the state's burden of proof, is . . . subject to constitutional harmless error analysis." 81 S.W.3d at 789; see also Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Page recognized that in many homicide trials, erroneous jury instructions misstating the applicable conduct element would be harmless error. See Page, 81 S.W.3d at 789. For example, in cases where the defense is that the defendant is not the perpetrator of the crime or in which causation is not disputed, the instruction would be harmless error. Id. However, when the mens rea of the accused is disputed, the harmlessness of the error is not as clear.

In the instant case, the appellant never denied shooting the victim. As alternative defenses, the appellant claimed either that the killing occurred by accident or was self-defense, focusing mainly upon self-defense. The appellant contended that she shot the victim when he "charged" at her as she sat at the kitchen table. Regardless, substantial proof supports the jury's finding of the appellant's guilt of second degree murder. Notably, Dr. Harlan stated that the bullet entered just above the victim's right ear and traveled in a straight trajectory through his brain. The victim was significantly taller than the appellant, rendering her version of events implausible. Further, the appellant had previously stated that she would "kill [the victim] one day," indicating a previously formed intent to kill. Moreover, the jury was properly instructed on the defenses of self-defense and accident, both of which the jury rejected. See State v. Marcillo Anderson, No. W2003-00013-CCA-R3-CD, 2004 WL 115429, at *6 (Tenn. Crim. App. at Jackson, Jan. 13, 2004), perm. to appeal denied, (Tenn. 2004).

More importantly, we note again that the bulk of the arguments presented by both the State and the appellant revolved around the appellant's claims of self-defense. As such, the appellant admitted that she intended to kill the victim in order to save herself from further abuse. Therefore, the appellant herself directed the jury's attention to the result of her actions, not the nature of her conduct. Furthermore, in its closing arguments, the State argued to the jury that the appellant "knew the consequences of her actions. Whether her conduct was reasonably certain to cause the result." This language emphasized the appellant's awareness of the result of her actions, not the nature of her conduct. The State also pointedly remarked that the appellant acted knowingly. The jury instructions specified that, in order to find the appellant guilty of second degree murder, the jury must find that she "acted knowingly." The specific definition for knowingly was defined solely in terms of the result of the appellant's conduct. Accordingly, we conclude that the error in this case, while regrettable, was harmless.

The appellant also contends that the trial court erroneously defined "recklessly" and "criminal negligence" in respect to the lesser-included offenses of second degree murder. In light of the appellant's conviction for the greater offense, we conclude that any error in those instructions was harmless.

### III.  Conclusion

Based upon the foregoing, we affirm the appellant's conviction.

_____
NORMA McGEE OGLE, JUDGE