# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 11, 2012 Session

## STATE OF TENNESSEE v. GERALD BRANDEN FITZPATRICK

### Direct Appeal from the Criminal Court for Davidson County
#### No. 2010-D-3267      Monte Watkins, Judge

### No. M2012-00186-CCA-R3-CD - Filed May 20, 2013

The Petitioner, Gerald Branden Fitzpatrick, was convicted in the Davidson County Criminal Court of aggravated sexual battery, a Class B felony. After a sentencing hearing, the trial court sentenced him to eleven years in confinement to be served at 100%. On appeal, the appellant contends that (1) the evidence is insufficient to support the conviction; (2) the trial court erred by failing to grant his motion for judgment of acquittal when the minor victim placed the date of the crime outside the dates alleged in the indictment; (3) the trial court erred by allowing the victim to testify through anatomical drawings rather than verbal testimony, which permitted the State to lead the victim; and (4) the trial court erred by allowing two State witnesses to give hearsay testimony. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, and ROGER A. PAGE, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Gerald Branden Fitzpatrick.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder and Jennifer Smith, Assistant Attorneys General; Victor S. Johnson, III, District Attorney General; and Kristin Menke, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In October 2010, the Davidson County Grand Jury indicted the appellant for rape of a child. The indictment alleged that the crime occurred between January 1, 2010, and June

15, 2010.

At trial, the then eight-year-old victim testified that she was born on January 18, 2003, was in the third grade, and lived with her mother; stepfather; eleven-year-old sister; and two younger brothers, seven-year-old Dayvion and three-year-old Chrishan.[1] The victim said that Marcia McGee was her stepfather's mother and that the appellant lived with Marcia. One night, the victim and Dayvion spent the night at Marcia's and the appellant's home. The children were sitting on the couch and were watching television. The victim said that they fell asleep and that the appellant made a "pallet" on the floor and moved the victim to the pallet. The victim said she "woke up" but pretended to be asleep because she "knew [the appellant] was going to do something." The appellant pulled down her pants and panties and put clear cream on his hand. The victim said the appellant "put it on my private part," which she said was her "bottom." The State showed the victim an anatomical drawing of a naked girl, and the victim circled the drawing's buttocks. She said that the appellant put the cream inside her bottom and that he touched the inside of her bottom with his "[p]rivate part." She said his private part was his "[p]eanuts." The State showed the victim an anatomical drawing of a naked adult male, and she circled the drawing's penis. The victim said that the appellant put his private in the part of her bottom where "[p]oop" comes out and that he moved his private up and down.

The victim testified that the appellant did not say anything to her because he thought she was asleep and that she asked him, "'What was that[?]'" The question was her way of asking the appellant what he was doing. The victim said the appellant lied and told her that her brother fell off the couch. The victim said that Dayvion had fallen off the couch earlier but that the appellant "knew I wasn't talking about that because that happened before he did what he did." She said the appellant "was just trying to pull something so he wouldn't get in trouble."

The victim testified that the appellant stopped what he was doing. The victim said that Marcia was upstairs sleeping when the incident occurred and that she did not tell Marcia because she "didn't want to disturb [Marcia] while she was sleeping." The victim also did not tell anyone about the incident the next day. However, at some point, she told her sister, and her sister told her to tell their mother. The victim said that when she told her mother, her mother "went crazy." Her mother telephoned Marcia, and Marcia came to their home. The victim told Marcia what had happened, and Marcia telephoned the appellant. After Marcia spoke with the appellant, Marcia started crying. The police arrived, and the victim told them about the abuse. She acknowledged that she spoke with a female interviewer and that she drew on an easel. The interview was recorded, and the victim watched the recording prior

---

[1]Because some of the witnesses share surnames, we will refer to them by their first names for clarity.

to her testimony. She said that she was always friends with the appellant, that she used to do fun things with him, and that she was not mad at him prior to the incident. She said that the incident happened in a "blue house," that Marcia's bedroom was upstairs, and that the abuse occurred downstairs in the living room. The victim stated that the incident occurred when she was seven or eight years old and that it occurred when she was in the second grade "or it might have happened summer break" between second and third grade.

On cross-examination, the victim acknowledged that the appellant was engaged to Marcia and that he had been living with Marcia for several years. She also acknowledged that the appellant was like her grandfather, that she had spent the night at Marcia's and the appellant's house several times, and that she enjoyed staying there. After the incident, a woman interviewed the victim. The victim said she did not remember saying during the interview that the abuse occurred when she was five or six years old. However, she acknowledged that she said it happened during the summer after kindergarten. The defense pointed out to the victim that she had just testified on direct examination that the incident occurred in the summer of 2011, between second and third grade. The victim stated, "I am confused." She said she did not remember which brother was on the couch with her on the night of the incident and that it could have been Chrishan or Chrishan and Dayvion. While the victim and her brother(s) were on the couch, the appellant was sitting in a chair in the living room. The victim said she just pretended to fall asleep on the couch because she knew he was going to do something. She said the appellant took the cream out of a white "[c]up or something" and that she saw the cup on a table in the living room before she went to sleep. During the incident, one of her brothers fell off the couch, awoke, cried, and went back to sleep on the floor. The appellant never said anything to the victim. The next morning, the victim ate breakfast, and her mother picked her up. The victim did not see or talk to the appellant. The victim acknowledged that she did not tell anyone about the incident for months or "a couple of years."

On redirect examination, the victim testified that she did not know what year the incident occurred but that she was probably six or seven years old. She was seven and eight years old when she was in the second grade. She said that when the appellant put the cream on her and touched her bottom, it felt "[n]asty and disgusting" but did not hurt. After the incident, the victim used the bathroom and washed her hands. The victim said she told her sister because she thought it was the right time and the right thing to do.

Kanethia McGee, the victim's mother, testified that she was married to Chris McGee, Marcia McGee's son. The appellant was Chris's father, but Chris did not learn the appellant was his father until he was thirty-one years old. Kanethia said that she and Chris had a good relationship with his parents and that Chris was just getting to know the appellant. Chris's parents lived in a house in the Buena Vista area of Nashville, and Kanethia allowed her

children to spend the night there one time. The victim referred to the house as the "blue house." Kanethia said that she thought Dayvion also spent the night and that the victim and Dayvion would have been seven and six years old, respectively

Kanethia testified that one night in 2010, the victim told her that the appellant "stuck his nuts in her bottom." Kanethia immediately telephoned Marcia and asked her to come to Kanethia's house. She said Marcia stated that the appellant "had done a lot of things, but he's definitely not a pervert." When Kanethia got off the telephone with Marcia, she telephoned 911. Marcia arrived at Kanethia's home before the police, and the victim told Marcia about the abuse. A few days later, Kanethia took the victim to Our Kids Center for a medical examination. The victim also was interviewed at Nashville Children's Alliance. Kanethia said that the victim reported the abuse to her in the summertime, possibly June 2010. Before the victim told Kanethia about the abuse, the victim was scared to sleep in her bedroom. Otherwise, the victim never exhibited any odd behavior that caused Kanethia to be concerned about the victim.

Tiffany Washington testified that she was a Child Protective Services investigator with the Department of Children's Services (DCS). DCS received a referral for the victim, and Washington contacted the victim's mother, who brought the victim to Washington's office. Washington interviewed the victim, and the victim told her the following: The appellant pulled down the victim's pants and panties and "rubbed cream on her butt in between her butt cheeks." Then he put his "nuts in her bottom, in the inside of her bottom." Washington showed the victim a male anatomical drawing, and the victim identified the drawing's penis as "nuts." The victim was lying on a pallet on the floor during the incident, and Dayvion was sleeping on the couch. The victim pretended to be sleeping, heard something fall, and asked the appellant, "'What is that?'" The appellant told her that Dayvion fell on her, but the victim knew the appellant was lying. The victim said the abuse occurred in the appellant's home when she was five or six years old.

Washington testified that she also interviewed the appellant. The appellant claimed the victim was lying.

On cross-examination, Washington testified that the victim was referred to her office on June 20, 2010, and that she interviewed the victim on June 24, 2010. The victim did not tell Washington that her youngest brother was present during the abuse.

Latoya Mitchell, a forensic interviewer with the Nashville Children's Alliance, testified that she interviewed the victim on July 1, 2010. The interview was video-recorded, and the State played the video for the jury. During the interview, the victim stated the following: The victim was at the appellant's house and was sleeping on the couch with her

brother, Dayvion. The appellant had put a pallet on the floor in case anyone fell off the couch. The appellant moved the victim to the pallet and pulled her pants and panties down "a little bit." He took soft, clear cream out of a white bottle and put it between the victim's "bottom." Then the appellant put his "nuts" in her "butt." Mitchell showed the victim an anatomical drawing of a naked male, and the victim circled the drawing's penis for "nuts." The victim told Mitchell that the appellant moved "up and down," that she pretended to wake up, and that the appellant stopped. The victim said the incident happened "a long time ago."

On cross-examination, Mitchell acknowledged that the victim said the only other person in the room was Dayvion. Mitchell also acknowledged that the victim said she was five or six years old at the time of the incident and that it happened in the summer after kindergarten.

Detective Charles Fleming of the Metropolitan Nashville Police Department's Sex Crimes Unit testified that he received an offense report from a patrol officer on June 20, 2010, and investigated this case. Detective Fleming received a referral about the victim from DCS on June 22, 2010. The incident had occurred several months previously. On August 5, 2010, Detective Fleming interviewed the appellant at the appellant's home. The appellant invited Detective Fleming inside and denied abusing the victim. The appellant described his relationship with the victim as "excellent" and said his grandchildren "loved" to come to his house. The appellant said that the children had spent the night at his home several months before the interview and that it was "cold outside." The police did not arrest the appellant until December 1, 2010.

On cross-examination, Detective Fleming testified that he never spoke with the victim. He obtained information about the incident by talking with the victim's mother and watching the victim's July 1, 2010 forensic interview. Marcia McGee was present during Detective Fleming's interview of the appellant. Detective Fleming acknowledged that the appellant did not try to avoid the police and adamantly denied the victim's allegations.

On redirect examination, Detective Fleming acknowledged that the appellant said the victim and her brother slept in the living room. The appellant told the officer that the children put blankets on the floor. Detective Fleming acknowledged that the appellant admitted to the victim's version of events except her allegation of sexual abuse.

Sue Ross, a pediatric nurse practitioner with Our Kids Center, testified that she interviewed and physically examined the victim on July 8, 2010. The victim told Ross that "[t]he head of his nuts went into my butt." Ross stated that the victim "went on to say it didn't go all the way in. And for her 'nuts' was [synonymous] with his penis." The victim did not have any pain or bleeding after the abuse. Ross said that based on the information

she had about the case, the abuse occurred about four months before she interviewed the victim. Ross said the victim's physical examination was normal, which was not unusual because "that part of the body is designed to expand and contract so to allow for feces to exit the body." On cross-examination, Ross acknowledged that she found no evidence that the victim had been sexually abused. At the conclusion of Ross's testimony, the State rested its case.

Marcia McGee testified for the appellant that in 2010, she and the appellant were engaged. They had been in a relationship for five years and were living together in a house on Highland Trace Drive. Marcia's son was married to the victim's mother, and Marcia and the appellant used to keep the couple's children. The last time the children spent the night at Marcia's and the appellant's house was in February 2010. Marcia thought that the victim, the victim's older sister, and Dayvion spent the night on that occasion. At some point, Marcia went upstairs to go to bed, and the appellant and the children stayed downstairs. The children were awake. Before Marcia went to sleep, the appellant came upstairs. Marcia went to sleep, and she did not know if the appellant went back downstairs. The next morning, everyone ate breakfast. The victim did not seem reserved or act unusual. Marcia did not see a bottle of cream downstairs that morning or the previous night. She learned about the victim's allegations in August 2010.

On cross-examination, Marcia testified that the children stayed with her and the appellant only one time while she and the appellant lived on Highland Trace Drive. The house was blue. She acknowledged that the appellant and the victim were good friends and said that she did not hear anything unusual downstairs when the children spent the night. When she learned about the victim's allegations, she went to the victim's house. She said the victim was not upset and "was trying to explain herself." She acknowledged that due to the victim's allegations, she was no longer in a relationship with the appellant.

The appellant testified that he and Marcia McGee used to babysit their grandchildren. The appellant acknowledged that he had a good relationship with the children and said that the children "always wanted to come over to our house, and we didn't mind." In 2010, the appellant and Marcia were living on Highland Trace Drive. On the night in question, the appellant and Marcia made a pallet on the floor for the victim's older sister to sleep on. The victim and her younger brother slept on the couch. Marcia went upstairs to bed while the appellant stayed downstairs and cleaned the kitchen. Then he went upstairs. He said that he decided to check on the children, walked half-way down the stairs, and returned to his and Marcia's bedroom. Marcia asked if the children were sleeping, and the appellant told her yes. The appellant and Marcia got into bed and went to sleep. The next morning, the appellant awoke and went downstairs. Shortly thereafter, Marcia and the children got up. The appellant cooked breakfast, and everyone ate. Nothing seemed unusual with any of the

-6-

children.

The appellant testified that one Sunday night when the weather was warm, the appellant and Marcia were watching a movie when Marcia received a telephone call from Kanethia McGee. Kanethia asked Marcia to come to Kanethia's house without the appellant. About one hour later, Marcia telephoned the appellant and told him about the victim's allegations. The appellant told Marcia to call the police. When Marcia returned home, she told the appellant that she had not called the police and told him, "'Let's wait and let's see what happens.'" The next morning, Marcia went to work, and the appellant went to the police department. He said he told the police that "some people might have said something about me" and asked if the police were looking for him. He said that the police told him that "'we don't have nothing on you, Mr. Fitzpatrick'" and that he went home. On August 5, 2010, the appellant spoke with Detective Fleming and told him what had happened the last time the children spent the night at his and Marcia's house. The appellant told the detective that nothing sexual occurred between him and the victim. On cross-examination, the appellant acknowledged that the victim falsely accused him.

The jury convicted the appellant of aggravated sexual battery, a Class B felony, as a lesser-included offense of rape of a child, a Class A felony. After a sentencing hearing, the trial court sentenced him to eleven years to be served at 100%.

On appeal, the appellant contends that (1) the evidence is insufficient to support the conviction; (2) the trial court erred by failing to grant his motion for judgment of acquittal when the minor victim placed the date of the crime outside the dates alleged in the indictment; (3) the trial court erred by allowing the victim to testify through anatomical drawings rather than verbal testimony, which permitted the State to lead the victim; and (4) the trial court erred by allowing two State witnesses to give hearsay testimony. As noted by the State, the appellant failed to include the transcript from the hearing on the motion for new trial in the appellate record. The appellant bears the burden of preparing an adequate record for appellate review. State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). Moreover, the failure to include the transcript from the motion for new trial hearing can result in a waiver of the appellant's issues. See id. at 560-61; Tenn. R. App. P. 24(b). However, we conclude that the record before us is sufficient to review the appellant's claims.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the conviction because nothing shows that he acted to achieve sexual gratification and because the victim

was impeached as to the date and place of the incident, gave inconsistent testimony as to who was present during the incident, and could not recall her conduct on the day following the incident. In short, the appellant contends that the victim was not credible. The State argues that the evidence is sufficient. We agree with the State.

The appellant was charged with rape of a child, which is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Aggravated sexual battery as it applies to this case is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim [and] . . . [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4). "'Sexual contact' includes the intentional touching of the victim's [or] the defendant's . . . intimate parts, . . . if that intentional touching can be <u>reasonably construed</u> as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6) (emphasis added).

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. <u>Id.</u> Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

Taken in the light most favorable to the State, the evidence shows that the appellant waited for Marcia McGee to go upstairs and for the children to fall asleep. He moved the victim onto the pallet, leaving her brother on the couch. He pulled down the victim's pants and panties, put cream on his hand, and rubbed the cream between her buttocks. The victim pretended to wake, and the appellant stopped what he was doing. Although the jury found that the appellant did not penetrate the victim, we conclude that the jury could have reasonably construed that he rubbed her buttocks for the purpose of sexual arousal or gratification. Regarding the victim's credibility, the jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. <u>See</u> <u>State</u>

v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury resolved the issue of credibility in the State's favor so as to convict the appellant of the lesser-included offense. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the evidence is sufficient to support the appellant's conviction for aggravated sexual battery.

## B. Indictment

The appellant contends that he is entitled to relief because the victim placed the date of the crime outside the dates alleged in the indictment. The State contends that there was no variance between the dates in the indictment and the evidence. We agree with the State.

The United States and the Tennessee Constitutions require that an indictment inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. An indictment satisfies this constitutional requirement "if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Relatedly, Tennessee Code Annotated section 39-11-201(a)(4) requires that the State must prove beyond a reasonable doubt that "[t]he offense was committed prior to the return of the formal charge."

In this case, the October 2010 indictment alleged that the crime occurred between January 1, 2010, and June 15, 2010. Subsequently, the State filed a bill of particulars, alleging that the offense occurred between January 1, 2010, and June 20, 2010. At trial, the defense pointed out to the eight-year-old victim that she testified on direct examination that the incident occurred in the summer of 2011, between second and third grade. However, the victim said she was confused about the date. Moreover, Kanethia McGee testified that the victim told her about the abuse in June 2010. Kanethia also testified that the victim spent the night with Marcia McGee and the appellant only one time when they lived in the "blue house" and that the victim was seven years old. The victim turned seven years old on January 18, 2010, and Marcia testified that the children last spent the night at her and the appellant's home in February 2010. Therefore, we conclude that there was no variance between the dates in the indictment or the bill of particulars and the evidence and that the evidence shows the crime was committed before the return of the indictment.

## C. Use of Anatomical Drawings

Next, the appellant contends that he is entitled to relief because the trial court allowed the victim to testify improperly through anatomical drawings, which allowed the State to lead the victim. The State argues that State did not lead the victim and that, in any event, the leading of minor victims is proper. We agree with the State.

The victim testified that the appellant moved her to the pallet and put clear cream on his hand. The State asked her if the appellant did something with the cream, and the victim hesitated to answer. The State asked the victim if it would help her to use drawings, and the victim said yes. The State passed an anatomical drawing of a girl to the victim and told the victim to "circle the body part that something happened with the cream." The victim circled the drawing's buttocks and said, "He took the cream and put some on his hand, and he put it on my private part." She said that the "private part" was her "bottom" and that the appellant touched the inside of her bottom with his hand. The State asked if any other part of the appellant touched the inside of her bottom and if it would help her to use another drawing. The victim answered yes. The State showed her a drawing of a naked adult male and told her to circle the part that touched the inside of her bottom. At that point, the appellant objected to "the manner in which these diagrams are being used. [They] are being used in lieu of her actually testifying to anything. . . . It is leading for sure." The trial court overruled the objection, the victim circled the drawing's penis, and the victim stated that the appellant put his "private part" in her bottom. As noted by the State, a trial court can allow leading questions of child sex offense victims on direct examination when necessary to fully develop the witness's testimony. Tenn. R. Evid. 611(c)(1). Regardless, we conclude that the State did not improperly question or lead the victim.

## D. Hearsay Testimony

Finally, the appellant contends that trial court erred by allowing Tiffany Washington and Latoya Mitchell to give hearsay testimony about the victim's allegations. The appellant contends that their testimony was not admissible as prior consistent statements because the victim's prior statements to them were inconsistent, not consistent, with her trial testimony. The State argues that the trial court properly admitted the testimony. We agree with the State.

On the morning of the second day of trial, the State informed the trial court that its next witness, Tiffany Washington, would be testifying about statements the victim made to her and that "it might be good to take this up before the jury comes in, if there is going to be any objection to her testifying to that." The State argued that her testimony was admissible because the appellant had impeached the victim's "ability to be truthful and accurately [recount] the events that occurred." Thus, the victim's prior consistent statements were admissible to rehabilitate her character for truthfulness. The appellant disagreed, noting that

the State also intended to play for the jury the victim's interview with Latoya Mitchell. The trial court agreed with the State, saying only, "Well, I am confronted with this issue all the time. And I'll allow it, particularly under State v. Neese[.]" The appellant did not object to Latoya Mitchell's testimony. However, when the State announced during Mitchell's testimony that it was going to play her video-recorded interview with the victim, the appellant said, "[S]ame objection as to Ms. Washington." The trial court allowed the State to play the video.

In State v. Benton, 759 S.W.2d 427, 433-34 (Tenn. Crim. App. 1988), this court explained as follows:

> [U]nder general evidentiary rules, prior consistent statements may be admissible, as an exception to the rule against hearsay, to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied. But before prior consistent statements become admissible, the witness' testimony must have been assailed or seriously questioned to the extent that the witness' credibility needs shoring up.

However, prior consistent statements are not hearsay because they are not offered for the truth of the matter asserted. See State v. Livingston, 907 S.W.2d 392, 398 (Tenn. 1995); State v. Joseph Shaw, Jr., No. W2009-02326-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 708, **18-19 (Jackson, Aug. 27, 2010), perm. to appeal denied, 2011 Tenn. LEXIS 22 (Tenn. 2011); State v. Albert R. Neese, No. M2005-00752-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 1023, *17 (Nashville, Dec. 15, 2006); Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[9] (6th ed. 2011).

In Albert R. Neese, this court concluded that the trial court did not err by allowing the State to play for the jury the victim's video-recorded forensic interview. No. M2005-00752-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 1023, at *18. Specifically, this court ruled that the interview was admissible as a prior consistent statement, stating,

> In light of the defendant's assertions of programming the victim by repetitive means, the interview corroborated the victim's testimony at trial. It was effective rebuttal in that the interview occurred during the initial investigation of the complaint before counseling sessions were instituted and prior to the repeated visits to counselors.

-11-

Id. Moreover, this court ruled that the evidence was not hearsay and that the trial court properly instructed the jury that the evidence could be considered only to assess the victim's credibility. Id.

Turning to the instant case, the appellant contends that the victim's interviews with Washington and Mitchell were not admissible as prior consistent statements because her statements to them were inconsistent with her trial testimony. Specifically, the appellant contends that the victim told Washington and Mitchell that the offense occurred when she was five or six years old but testified at trial that the offense occurred when she was seven or eight years old.

Granted, the victim's direct examination testimony regarding the date of the crime was inconsistent with her prior statements to Washington and Mitchell regarding the date. However, the remainder of her prior statements to Washington and Mitchell, including her forensic interview with Mitchell, were highly consistent with her trial testimony. Through the defense's cross-examination of the victim, it insinuated that she had fabricated her allegations because she gave inconsistent dates for the crime, could not recall which of her brothers was present in the living room at the time of the incident, and could not recall her activities the next morning. The appellant acknowledges in his brief that the victim "was impeached as to her memory and the accuracy of her testimony repeatedly." Therefore, we conclude that the trial court did not err by ruling that the victim's prior statements to Washington and Mitchell were admissible as prior consistent statements.

### III.   Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-12-