# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 16, 2014

## STATE OF TENNESSEE v. DESHAWN MAHON MANCILL[1]

**Direct Appeal from the Criminal Court for Knox County**
**No. 99058C     Steven W. Sword, Judge**

---

**No. E2014-00278-CCA-R3-CD - Filed February 6, 2015**

---

The appellant, Deshawn Mahon Mancill, was convicted by a jury in the Knox County Criminal Court of possession of heroin with the intent to sell or deliver.  The trial court sentenced the appellant as a Range II, multiple offender to sixteen years in the Tennessee Department of Correction.  On appeal, the appellant challenges the sufficiency of the evidence supporting his conviction.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROGER A. PAGE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Dustin S. Dunham, Knoxville, Tennessee, for the appellant, Deshawn Mahon Mancill.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence Lutz, Senior Counsel; Randall E. Nichols, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

A Knox County Grand Jury returned a multi-count indictment charging the appellant and two co-defendants, Ricky Brown and Ronald Scott Crigger, with possession of less than 15 grams of heroin with the intent to sell; possession of less than 15 grams of heroin with the intent to deliver; possession of alprazolam with the intent to sell; possession of alprazolam with the intent to deliver; possession of clonazepam; being a convicted felon in possession

---

[1]The indictment lists two aliases for the appellant: "Deshawn Ramsey" and "Chico."

of a .40 caliber handgun with the intent to go armed; and being a convicted felon in possession of a .380 caliber handgun with the intent to go armed. The appellant's case was severed from his co-defendants' cases.

At the appellant's trial, Ricky Brown testified that he lived in Knoxville and that he owned Studio Premonition, a business on Magnolia Avenue. Approximately five or six months prior to July 2011, the appellant, who was Brown's older cousin, moved to Knoxville from Detroit, Michigan, and lived mostly with Brown. Brown had purchased heroin from the appellant three or four times within the weeks before the instant offenses.

Brown said that on July 28, 2011, he spent the day with the appellant and Crigger. They went to Walmart and then proceeded to Brown's studio. While they were at the studio, Brown noticed that the appellant had heroin and several other types of drugs in a shopping bag and a firearm tucked into his waistband. As the men prepared to leave to go to a shopping mall to sell heroin, Brown told the appellant that he could not get into Brown's vehicle, which had been rented by Brown's wife, "with all of that stuff on him." The appellant removed three packets of heroin from the bag and put the firearm and the bag with the remaining drugs into a city dumpster outside the studio. Brown noticed that Crigger had a gym bag in the back seat with him; however, Brown did not know what was in the bag. Along the way, the men stopped at Sav-Way so the appellant could wire money to his brother, Marvin. Brown said that the appellant had another brother, Myron, who went by the nickname "Black Goat." Marvin and Myron lived in Detroit.

Brown said that after they left Sav-Way, they went to the mall, where the appellant intended to sell two packets of the heroin to two women they had just met. The other packet of heroin was for Brown and Crigger; Brown intended to pay for the heroin later. After they parked, the appellant left the heroin in the cup holder on the front center console and walked into the mall. Brown and Crigger smoked a marijuana cigarette and then followed the appellant. The men waited in the mall for about three hours, but the two women never arrived. The men left the mall and got back into the car. The heroin was still in the cup holder between Brown and the appellant. Brown backed out of the parking space while talking on his cellular telephone and trying to put on his seatbelt.

Brown said that after they left the parking lot, he noticed an unmarked police truck behind him with its lights flashing, and he pulled over. Because the heroin would have been visible from outside the vehicle, Brown panicked, grabbed the packets of heroin, and put them in his pocket. The police searched the vehicle and found his wife's .40 caliber Glock handgun in a lock box under the center console and a .380 caliber Bersa handgun in Crigger's gym bag. Brown did not know that the weapons were in the car. Police also found a set of scales that could be used to weigh drugs. Brown did not know the scales were in the

vehicle, but he had seen the appellant with scales on previous occasions.

On cross-examination, Brown acknowledged that he was "high" at the time he was stopped by the police. Brown further acknowledged that the police found the heroin in his pocket. Brown also was indicted for the possession of twenty-five Xanax pills the police found in his left pocket and for possession of the .40 caliber Glock handgun.

On redirect examination, Brown said that one packet of heroin could be sold for thirty dollars. Brown bought the pills from a friend "from off campus."

Upon questioning by the court, Brown said that he did not know his wife's gun was in the vehicle. He explained that the lock box in the console could be unlocked with the key to the vehicle. Brown stated that Crigger kept his gym bag closed while it was in the vehicle.

Ronald Scott Crigger testified that he had not been promised anything in exchange for testifying truthfully against the appellant. Crigger said that at the time of the offense, he and Brown had been friends for almost three years and that they "got high" together by using alcohol, marijuana, heroin, or Xanax. Crigger met the appellant at Brown's studio about six months before the offenses. After meeting the appellant, Crigger began buying heroin from him three times a week, paying thirty dollars for each pack of heroin.

Crigger said that he spent the day of July 28, 2011, with the appellant and Brown. Around noon, Brown drove them to Walmart. While they were there, the appellant said that he did not have his identification with him and asked Crigger to help him wire $1300 to his brother, Myron Ramsey. The appellant filled out the form for the "Money Gram," including the recipient's name and address, and provided the cash; Crigger signed his name to the form and used his identification to complete the purchase. Crigger said that the appellant had not been employed during the time Crigger had known him.

Crigger said that after they left Walmart, they went to Brown's studio. At 1:28 p.m., they proceeded to Sav-Way, and Crigger helped the appellant send $1500 to the appellant's brother, Marvin Ramsey. Crigger did not know how the appellant obtained the money.

Crigger stated that after they left Sav-Way, they returned to Brown's studio, "[s]norted" some heroin supplied by the appellant, then drove to the mall so that Crigger could purchase "funeral clothes." Crigger said that he had been staying at a motel and that he had his belongings, including a loaded gun, with him in a black gym bag. Crigger explained that he had the gun because the place he had been staying was "known for prostitution[,] crackheads, and robberies."

Crigger said that when they arrived at West Town Mall, the appellant gave the heroin to Brown. Crigger was sitting in the back seat and could not see what Brown did with the drugs. Brown intended to purchase one pack of the heroin and split it with Crigger. The remainder of the heroin was to be sold to a girl named Cheyenne; however, she did not show up.

Crigger said that after they were arrested and placed in a paddy wagon, the appellant told him that if he did not "watch what [he said, he] might not say anything ever again." Later, the appellant sent Crigger a letter, instructing him to implicate Ricky Brown and exonerate the appellant.

On cross-examination, Crigger said that he and Brown were close friends and that they saw each other almost daily. After his arrest, he was interviewed by agents from the federal Drug Enforcement Agency (DEA), and he told them about the drug activities in which he and Brown had engaged for years. Later, when speaking with the district attorney general, Crigger said that he was "high" during the interview with the DEA, that his statements were "exaggerated," and that he could not remember everything that happened during the interview.

On redirect examination, Crigger said that during the booking process, the appellant told the intake officer that his last name was Ramsey; Crigger had never heard the appellant use that name. Crigger told the DEA agents that he bought all of his heroin from the appellant.

Upon questioning by the trial court, Crigger said that he never removed his gun from his gym bag, that he never discussed the gun with Brown or the appellant, and that neither Brown nor the appellant ever saw the gun.

Knox County Sheriff's Detective Adam Mitchell, an interdiction officer, testified that around 6:30 p.m. on July 28, 2011, he saw a rental vehicle, specifically a white, 2011 Dodge Durango, traveling on Kingston Pike. He noticed that the driver was not wearing a seat belt. He initiated a traffic stop to issue a citation to the driver. As Detective Mitchell walked toward the vehicle, he saw the driver reaching underneath the seat. Detective Mitchell was concerned for his safety and asked the occupants to step out of the vehicle.

Detective Mitchell said that he called for the assistance of a "K-9" officer. When the officer arrived, he walked a drug dog around the vehicle to perform a "sniff." The officer informed Detective Mitchell that the dog had alerted on the vehicle. Detective Mitchell searched the vehicle. Underneath the driver's seat where Brown had been sitting, Detective Mitchell found a half-full magazine for a .40 caliber Glock handgun. In the unlocked center

console, Detective Mitchell found a thirty-round magazine for a .40 caliber Glock handgun and "an A.R. mag with .233 rounds inside of it." The magazine was the type used to load an assault rifle; however, no rifle was found in the car. Detective Mitchell also discovered a couple of pills in the floorboard on the driver's side. Underneath the floor mat on the passenger side where the appellant had been sitting, Detective Mitchell located a set of scales, which were the type used to package illegal narcotics for distribution. A loaded .40 caliber Glock handgun and three thirteen-round magazines for the Glock were in the unlocked glove compartment. In a bag on the back seat, Detective Mitchell found a .380 caliber Bersa semi-automatic handgun.

Detective Mitchell advised the men of their Miranda rights and asked if they were willing to speak with him. Once the men agreed to cooperate, Detective Mitchell separated them to interview them individually. The appellant did not make a statement.

Detective Mitchell said that he performed a pat-down on the men. On Brown's person, Detective Mitchell discovered "packets of a plastic baggie containing lottery tickets that contained like a brown sugar substance." Detective Mitchell believed the substance was heroin because it was typically sold folded in a lottery ticket. Also in Brown's possession were twenty-five Xanax pills. Detective Mitchell found $206 on Brown and approximately $3300 on the appellant. Detective Mitchell said that the currency was in denominations of ten-, twenty-, and one-hundred-dollar bills, which was consistent with the denominations used in the sale of narcotics. Brown and the appellant each possessed a cellular telephone. The men were arrested, and their vehicle was towed.

Detective Mitchell said that the appellant's cellular telephone records reflected that on July 28, 2011, a text message was sent from the appellant's telephone to "Black Goat," saying, "It's a Money Gram, No. 86756578, Ronnie Scott Crigger." A later message from "Black Goat" acknowledged receipt of the money. At 12:42 p.m., a text message that read "Western Union, 0580904788, Ronald Crigger" was sent from the appellant's telephone to "Marv." A return message from "Marv" asked, "How much?" The appellant responded, "1500."

On cross-examination, Detective Mitchell said that the .40 caliber Glock he found in the glove compartment belonged to Brown's wife. Detective Mitchell did not find any drugs on the appellant.

Michael Bleakley, a special agent forensic scientist with the Tennessee Bureau of Investigation's (TBI) crime laboratory, testified that he tested the twenty-five white pills taken from Brown and that they were alprazolam, a schedule IV controlled substance. He also tested half of a blue tablet, which was identified as clonazepam, a schedule IV controlled

-5-

substance. He tested four yellow tablets and determined they were trazodone, which was not a controlled substance. The brown powder substance tested positive for heroin. Agent Bleakley said that he did not obtain a net weight of all the powder; however, "[t]he net weight of the powder that was tested was 0.05 grams, and the gross weight of the other two lottery tickets and powder combined was 0.36 grams."

Federal Bureau of Investigation (FBI) Agent Andrew C. Chapman testified that on July 28, 2011, he was called to assist with the investigation, primarily because of his involvement in the investigation of heroin drug dealers in Detroit. When he arrived, the scene was still being processed. He learned that a few packets of heroin, cash, and firearms had been recovered from the defendants. Agent Chapman said that finding loaded guns and extra ammunition in close relation to heroin was not uncommon. Additionally, he knew that heroin from Michigan was frequently packaged in lottery tickets. He did not know that scales were found, but he stated that scales were frequently used by people who sold heroin or cocaine. Agent Chapman said that a packet of heroin containing .1 gram usually sold for thirty to forty dollars. He noted that having a group of people, as opposed to a single individual, involved in selling heroin was not uncommon. He explained that the people in the group could have different roles in the enterprise. Agent Chapman further noted that he had seen a number of wire transfers from drug dealers in Tennessee to pay their suppliers in Detroit. He stated, "[T]hey usually have other people who they have wire money for them so it's not building a track record under their own name."

Agent Chapman learned that the defendants "had a Michigan connection," which made him want to investigate further. At least one of the defendants indicated a desire to speak with Agent Chapman, so they were transported to the Knox County Detention Facility to be interviewed.

Agent Chapman said that the appellant declined to be interviewed. Nevertheless, the appellant told the officers, "Look, here's the way I see it. . . . The guns are not mine. The drugs were on somebody else. . . . I had a quantity of money in my pocket that may or may not have been []legally earned." Agent Chapman said that the appellant was not rude and that he spoke in a "business like" manner.

At the conclusion of the State's proof, defense counsel made a motion for a judgment of acquittal on all charges. The trial court granted the motion as to the charge of being a convicted felon in possession of a .380 caliber handgun with the intent to go armed but overruled the motion as to all other charges.

The appellant testified that he grew up in Detroit but that he came to Knoxville to live a few months prior to his arrest. He said that on July 28, 2011, he, Brown, and Crigger went

by Brown's studio to clean up from a party that had been held there the previous night. The appellant said that the parties at Brown's studio were attended by "college kids." At the parties, the appellant, Brown, and Crigger "partied, we all used drugs of different sorts, Xanax, heroin, marijuana, and we all drank."

The appellant said that they also stopped so he could transfer money to his brothers to help his mother who was being evicted; however, he did not say where they stopped. The appellant said that neither Brown nor Crigger knew about his family's troubles. The appellant had left his identification in his workout clothes; therefore, he asked Crigger to make a transfer to each of the appellant's brothers: one to Marvin Ramsey and the other to Myron Ramsey.

The appellant said that after making the money transfers, they went to the mall to buy clothes for upcoming events. Afterward, as Brown was reaching for his seat belt while driving the men away from the mall, an officer initiated a traffic stop. Brown told the appellant that they were being pulled over because Brown was not wearing his seat belt. While Detective Mitchell was approaching the vehicle, Brown reached under his seat. The appellant denied that any drugs were in the vehicle.

The appellant said that Detective Mitchell asked the men to step out of the vehicle. They complied and sat on the curb. A "K-9" unit arrived, and officers searched the vehicle. The appellant heard the officers say that they found guns and pills in the vehicle. The appellant asked Brown, "What all you got in the car?" Brown responded that he had drugs in his pocket.

The appellant said that after the guns were found, the officers handcuffed them, advised them of their Miranda rights, and searched them. The appellant told the police, "You can have my phone. You don't have to get a search warrant. I have nothing to hide." As the officers searched the appellant, they found receipts for the two money transfers. Additionally, they confiscated $3200 in cash from the appellant. During a search of Brown, the officers found heroin and "a whole bunch of white pills" in his pocket.

The appellant said that he had no drugs in his possession and had nothing to do with the drugs found in the vehicle or on Brown's person. The appellant said that if he had known about the drugs, he would have told Brown to get rid of them or would have refused to ride in the vehicle with them. The appellant also denied knowing about the guns in the vehicle. He stated that they went to the mall to buy clothes, not to sell drugs. The appellant said that the money he had in his pocket was all the money he had and that he had taken it from his savings to move to Knoxville. The appellant explained that he was carrying all of his money with him because Brown and Brown's wife were "hitting [his] pockets."

-7-

The appellant acknowledged that he, Brown, and Crigger had previously sold and used drugs; he denied possessing or selling any drugs on July 28. He asserted that Brown reached under the seat of the car to hide something; however, he ran out of time and shoved the items in his pocket.

On cross-examination, the appellant said that Ramsey was his father's last name, that his mother's maiden name was Mancill, and that his parents were not married when he was born. The appellant acknowledged a prior conviction for armed robbery. The appellant said that he had started working at Ole Ben Franklin Motors in west Knoxville shortly before his arrest and that he had been living with Brown in low income housing. The appellant paid a small amount of money to offset the groceries he used while living there. The appellant said that he had previously sold Xanax or sleeping pills. He had used heroin but claimed that selling heroin was Brown's "area." The appellant acknowledged that his brother, Myron Ramsey, went by the nickname "Black Goat."

At the conclusion of the proof, the jury convicted the appellant of possession of less than .5 grams of heroin with the intent to sell and possession of less than .5 grams of heroin with the intent to deliver; the appellant was acquitted of all other charges. At the sentencing hearing, the trial court merged the two convictions and imposed a sentence of sixteen years. On appeal, the appellant challenges the sufficiency of the evidence supporting his conviction.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App.

1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to sustain the appellant's conviction, the State was required to prove that the appellant knowingly possessed heroin with the intent to sell or deliver. Tenn. Code Ann. §§ 39-17-406(c)(11); 39-17-417(a)(4), (b). The appellant insists that there was no "consistent" evidence that he possessed or intended to sell the heroin or that he constructively possessed the heroin with the intent to sell. He complains that the State's witnesses "gave conflicting testimony about the heroin," such as Brown's assertion that the appellant left the heroin in the cup holder compared with Crigger's assertion that the appellant handed Brown the heroin. The appellant further notes that although Crigger never indicated the men sold heroin earlier in the day, Brown said the appellant sold heroin to two women that day. He argues, accordingly, that the evidence was insufficient to sustain his conviction. The State counters that the evidence is sufficient.

Turning to the merits of the appellant's claims, we note that our case law establishes that possession of an object can be either actual or constructive. See State v. Transou, 928 S.W.2d 949, 955 (Tenn. Crim. App. 1996). To find constructive possession, it must be shown that the person accused had the power and intention at a given time to exercise dominion and control over the object directly or through others. See State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). In other words, "'constructive possession is the ability to reduce an object to actual possession.'" Id. (quoting State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)).

In the light most favorable to the State, the proof at trial revealed that the appellant had recently moved to Knoxville from Detroit and that he lived with his cousin, Brown. After the appellant's arrival in Tennessee, Crigger and Brown bought heroin from him on multiple occasions. On July 28, 2011, the three men made two separate stops so that the appellant could wire large sums of money to his brothers in Detroit. The appellant supplied the cash but used Crigger's identification and name on the transfers. The police later found receipts and text messages corroborating the transfers. While the men were together, the appellant sold heroin to two women. The men went to the mall to sell more heroin to the women and to buy clothes. Before they entered the mall, the appellant left the heroin in the cup holder in the center console of the vehicle. After leaving the mall, they were stopped by Detective Mitchell. As Detective Mitchell approached the vehicle, Brown put the heroin in his pocket to conceal it. The police searched the vehicle and found two handguns and a set of scales that could be used for weighing drugs, such as heroin or cocaine, for sale. Brown admitted that he had seen the appellant with scales on previous occasions. Detective

Mitchell searched Brown and found heroin packaged inside of lottery tickets, which was the typical way heroin from Detroit was packaged. Agent Chapman said that he had investigated "Detroit based heroin drug dealers" and noted that drug dealers in Tennessee commonly used other people to assist them in making wire transfers to pay their suppliers in Detroit to avoid "building a track record under their own name." The appellant, who was not employed, had a large amount of cash in denominations commonly found on drug dealers. After the men were arrested, the appellant threatened Crigger. Additionally, the appellant acknowledged to Agent Chapman that the money found on the appellant's person may not have been legally obtained. Sometime later, the appellant sent Crigger a letter, ordering him to implicate Brown and exonerate the appellant.

Although the appellant attempted to explain the money transfers and to shift the blame entirely to Brown, the jury discredited the appellant's version of events and accredited the testimony of the State's witnesses. The jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the evidence was sufficient to sustain the appellant's conviction of possession of heroin with the intent to sell or deliver.

### III. Conclusion

Finding no error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE