IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

December 6, 2016 Session

### STATE OF TENNESSEE v. ARNEKIO JACKSON

**Appeal from the Criminal Court for Shelby County**
**No. 14-05601      Carolyn Wade Blackett, Judge**

_____

### No. W2015-02236-CCA-R3-CD

_____

A Shelby County Criminal Court Jury found the Appellant, Arnekio Jackson, guilty of aggravated robbery.  The trial court sentenced the Appellant as a Range II, multiple offender to sixteen years in the Tennessee Department of Correction.  On appeal, the Appellant contends that the State committed prosecutorial misconduct by intentionally introducing evidence that the trial court had ruled was inadmissible and that without the evidence, the proof was insufficient to establish the Appellant's identity and sustain his conviction.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

James Jones, Jr., Memphis, Tennessee, for the Appellant, Arnekio Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Goodman, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The thirty-year-old victim, Nicholas Talarico, testified that on May 1, 2014, he lived in an apartment in Kimbrough Towers in midtown Memphis.  Around midnight, he parked his car on East Moreland near his apartment building.  The victim said that street lights were located nearby and that it was dark but not "pitch black."  He got out of the car, grabbed his bag, and read an email on his cellular telephone.  As he walked through a small park to get to the back entrance of his apartment building, he heard a "weird

shuffling, running noise." He turned around and saw a man, who was later identified as the Appellant, holding a gun and running toward him. The Appellant was wearing a hoodie and white or light-colored gloves, and a white bandanna was covering part of his face. The victim "froze," then turned to keep walking, changed his mind, turned back around, tripped, and fell. As he fell, the victim dropped his cellular telephone, and some other items, including his laptop computer, fell out of his bag. The Appellant told the victim, "[G]ive me your wallet." The victim removed his identification from his wallet and gave the wallet to the Appellant. The victim estimated that the wallet contained less than twenty dollars in cash. The Appellant asked how much money the victim had in his bank account, and the victim responded that he had only fifty or sixty dollars. The Appellant removed the cash and the victim's debit card from the wallet, threw the wallet onto the ground, and walked away. He did not take the victim's computer or cellular telephone. The victim described the incident as "incredibly frightening" and "confusing."

After the Appellant left, the victim collected his belongings, ran to his apartment, and called 911. When the police arrived, the victim went outside and showed them where the crime occurred. He described the Appellant and the Appellant's clothing. Shortly thereafter, the police returned with a suspect "that they thought had done it." The victim told the police, "I don't think that's him. I'm not 100 percent sure."

The victim recalled that the next day, the police showed him a photograph array, from which he identified the Appellant as the perpetrator. The State showed the victim a photograph of clothing, and the victim said the clothing was consistent with the clothing the Appellant was wearing during the crime.

On cross-examination, the victim said that he had never seen the Appellant before that night. The victim recalled telling the police that the Appellant "was wearing white gloves I think." The victim acknowledged, "[I]t was very much hard for me to see past the gun." Defense counsel asked if the victim told the police the perpetrator's race, and the victim responded, "When the police came, I was – no. I was more – I couldn't at the time put together the hands and the face as in my head." However, the victim said that he later told a detective that the Appellant was a black male. The victim said that he was not sure the suspect the police showed him on the night of the offense was the Appellant, acknowledging that the "whole situation" made him feel "very uncomfortable." The victim conceded that the suspect brought to the scene matched the description he gave of the perpetrator but that the suspect "was not dressed the same as the" perpetrator.

Memphis Police Sergeant Jeff Dennison testified he showed the victim a photograph array that included a photograph of the Appellant. After viewing the photographs, the victim identified the Appellant as the perpetrator.

Sergeant Dennison said that he saw the Appellant "close [in] time" to his interview of the victim. Sergeant Dennison noted the differences between the Appellant's appearance in court and his appearance shortly after the robbery, saying:

> He was a lot dirtier then. He had long dreads, long dread hair cut or hairstyle. And just he had – he was wearing like a dark hooded, dark hoodie type thick jacket. He had white like type garden gloves and like a white bandanna or white towel. Those were part of his articles of clothing he had on.

On cross-examination, Sergeant Dennison said he brought a suspect, Travis Jones, to the victim "right after" the victim reported the robbery, but the victim said "he couldn't confirm" Jones was the perpetrator. Sergeant Dennison recalled that he asked the victim to describe the perpetrator, and the victim said:

> [H]e was taller. About 6 foot 2. He weighed probably, I don't know. He wasn't real big. He was wearing a baggy sweatshirt thing. He had on pants and a white bandanna around his face. The bandanna was partially covering his face. He was wearing white gloves I think. I remember being really confused.

Sergeant Dennison said that some fingerprints were discovered at the scene but that he did not think any of the fingerprints were "linked" to the Appellant. Sergeant Dennison stated that the fingerprints were "[o]f unknown value, I don't know. I don't recall if they came back or if they were of no value or what."

On redirect examination, Sergeant Dennison said that "an officer attempted to lift a fingerprint from [the victim's] debit card." Sergeant Dennison stated that fingerprints were found on the debit card but that none matched the Appellant's fingerprints. Sergeant Dennison explained that a person wearing gloves would not leave a fingerprint on a debit card.

On recross-examination, Sergeant Dennison said that the fingerprints found on the debit card were compared only with the Appellant's fingerprints.

The Appellant did not testify or present proof.

The jury found the Appellant guilty of aggravated robbery. At the sentencing hearing, the Appellant conceded that he was a Range II, multiple offender. The trial court imposed a sentence of sixteen years. On appeal, the Appellant contends that the

State committed prosecutorial misconduct by intentionally introducing evidence which the trial court had ruled was inadmissible and that without that evidence, the proof was insufficient to establish his identity and to sustain his conviction.

## II. Analysis

### A. Prosecutorial Misconduct

The Appellant contends that prior to opening statements, he asked the trial court to prohibit the State from using any facts related to a carjacking offense which occurred shortly before the victim was robbed. The Appellant was charged by a separate indictment for the carjacking. The Appellant maintains that the trial court "ruled that any and all facts and evidence obtained in any other indictment w[ere] inadmissible" and that the State deliberately violated the trial court's ruling to bolster its weak evidence on identity. The State asserts that the Appellant waived the issue and that, regardless, the State did not violate the trial court's evidentiary rulings. We agree with the State.

In order to prevail on a claim of prosecutorial misconduct, the Appellant must demonstrate that the prosecution's conduct was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). In making this determination, this court is guided by five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

First, we note that Tennessee Rule of Appellate Procedure 24(b) provides that "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." As the State notes, the trial transcript begins

- 4 -

in the middle of a bench conference during which defense counsel was complaining about the State's opening statement.[1] Without a transcript of the entire bench conference and a transcript of the State's opening statement, we are unable to discern what error, if any, occurred. "Because it is the duty of the appellant to prepare a record which includes the proceedings relevant to an issue on appeal, the doctrine of waiver applies." State v. Ivy, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). Therefore, we conclude that the Appellant has waived any complaint relating to the State's opening statement.

Next, the Appellant contends that the State committed prosecutorial misconduct by asking Sergeant Dennison to describe the Appellant during direct examination and by mentioning the description during closing arguments. The State contends that the Appellant waived the issue by failing to object at the time of Sergeant Dennison's testimony and during closing arguments. In the alternative, the State contends that it did not violate any evidentiary ruling.

The rules of evidence provide that "[o]nce the [trial] court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Tenn. R. Evid. 103(a)(2); see State v. Ethan Alexander Self, No. E2014-02466-CCA-R3-CD, 2016 WL 4542412, at *51 (Tenn. Crim. App. at Knoxville, Aug. 29, 2016), perm. to appeal denied, (Tenn., Jan. 19, 2017). Therefore, we must first determine whether the Appellant objected to Sergeant Dennison's testimony, then we must determine the trial court's ruling on the objection.

The record reveals that after the State's opening statement, the Appellant objected to the State's informing the jury of the circumstances of the Appellant's arrest, including that he was found two hours after the robbery near a stolen car in an area not far from the robbery. The Appellant explained that the arrest was related to a carjacking case for which the Appellant was not on trial and that it was not relevant. The State responded that the Appellant's clothing at the time he was apprehended was relevant to his identification as the perpetrator of the aggravated robbery. The court cautioned the State that it would have difficulty introducing evidence regarding the Appellant's arrest without introducing evidence of the carjacking. Nevertheless, the trial court agreed to allow the State to make an offer of proof. Defense counsel then gave his opening statement. Thereafter, the victim testified as the State's first witness.

Following the victim's testimony, the State presented its offer of proof, during which Memphis Police Officer Allen Pendleton testified. Officer Pendleton said that on May 1, 2014, he heard a police broadcast to look for an unidentified "tall, thin, male

---

[1]The trial transcript reflects that "no audio" existed of the State's opening statement.

black, wearing a dark hooded jacket, with a white towel over his face wearing white gloves, all dark clothes, dark jacket and pants." The broadcast further provided that the man was in a silver Chevrolet Equinox with Nebraska tags. After the Equinox was seen in the "area of Perkins, south of Summer," Officer Pendleton and six other officers proceeded to the area. Officer Pendleton saw the Appellant on the back porch of a nearby residence. The Appellant "was wearing a dark hooded jacket. He had a white towel stuffed into the collar of the jacket. He also had white gloves and dark pants and he was a tall, thin, male black." Upon seeing the officers, the Appellant attempted to flee but was apprehended. The officers did not find a weapon in the Appellant's possession.

At the end of its direct examination, the State told the trial court that it intended to avoid introducing proof about the carjacking but that it wanted to introduce proof that hours after the robbery, the Appellant was arrested while wearing clothing that matched the victim's description of the perpetrator's clothing. Defense counsel argued that the evidence regarding the circumstances of the Appellant's arrest should not be admitted because the Appellant could not refute that he was present in the area without revealing the facts of the carjacking case, which were too prejudicial. The trial court observed that if Officer Pendleton testified he arrested the Appellant, the jury would want to know the offense for which the Appellant had been arrested, which could lead to the introduction of facts concerning the carjacking case.

The court stated that it would "possibly" allow the State to show that the Appellant was seen in certain clothes during the robbery and that he was seen two hours later wearing the same clothes, which the court acknowledged was relevant to identification. The court then asked if defense counsel would have a "problem" with that decision. Defense counsel responded, "Your Honor, I guess if it was – if that was the only information . . . . The problem though is that we have nothing to get us there. . . ." The trial court agreed with defense counsel that any information concerning the carjacking case was not relevant and was highly prejudicial to the Appellant but said that the State might be able introduce proof regarding the Appellant's clothing on the night of the robbery if the State could avoid mentioning the facts of the carjacking case.

Thereafter, the jury returned to the courtroom. The State called Sergeant Dennison, who testified that victim identified the Appellant as the perpetrator after looking at a photograph array. The State asked if Sergeant Dennison saw the Appellant around the same time he spoke with the victim, and Sergeant Dennison said that he had. The State asked Sergeant Dennison if the Appellant's appearance at trial was different and, if so, to describe the differences. Sergeant Dennison said:

> He was a lot dirtier then. He had long dreads, long
> dread hair cut or hairstyle. And just he had – he was wearing
> like a dark hooded, dark hoodie type thick jacket. He had

white like type garden gloves and like a white bandanna or white towel. Those were part of his articles of clothing that he had on.

Before cross-examining the witness, defense counsel requested a bench conference, during which he asked the State to reveal where Sergeant Dennison came into contact with the Appellant. The State responded, "The only contact that I know of between Sergeant Dennison and the [Appellant] was in this building." The trial court asked, "Can we leave it at that?" Defense counsel replied, "That's fine." Defense counsel then cross-examined Sergeant Dennison about the victim's identification of the Appellant and his description of the perpetrator.

Thereafter, on three brief occasions during closing argument the State mentioned Sergeant Dennison's testimony describing the Appellant and the Appellant's clothing. Defense counsel did not object to Sergeant Dennison's testimony describing the Appellant's clothing or to the State's closing argument.

Initially, we note that the Appellant has waived his complaints regarding Sergeant Dennison's testimony and the State's closing arguments because he failed to make contemporaneous objections. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). In any event, because Sergeant Dennison did not testify about the specific details of the Appellant's apprehension, we conclude that the State did not violate the trial court's ruling and therefore did not commit prosecutorial misconduct. We conclude that the Appellant is not entitled to relief on this issue.

B. Sufficiency of the Evidence

As his final issue, the Appellant challenges the sufficiency of the evidence sustaining his conviction. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all

factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of the evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103(a).

In the light most favorable to the State, the proof adduced at trial revealed that around midnight on May 1, 2014, the victim was walking through a small park toward his apartment building when he heard a noise, turned, and saw the Appellant holding a gun and running toward him. The Appellant was wearing a hoodie and white or light-colored gloves, and a white bandanna was covering part of his face. The Appellant told the victim, "[G]ive me your wallet." The victim removed his identification from the wallet and gave the wallet to the Appellant. The Appellant took the cash and the victim's debit card from the wallet, then threw the wallet onto the ground and walked away. The victim ran to his apartment building and called the police. When the police arrived, the victim showed them where the crime occurred and gave them a description of the Appellant and his clothes. Hours after the robbery, Sergeant Dennison saw the Appellant wearing clothing that matched the victim's description of the perpetrator's clothing. On May 2, Sergeant Dennison showed the victim a photograph array, and the victim identified the Appellant as the perpetrator.

The Appellant contends that without Sergeant Dennison's description of the Appellant's clothing, which the Appellant maintains was "inadmissible evidence," the State did not prove beyond a reasonable doubt that the Appellant committed aggravated robbery. However, as we concluded earlier, the State did not commit prosecutorial misconduct by asking Sergeant Dennison to describe the clothing the Appellant was wearing hours after the robbery. This issue is without merit.

The Appellant further contends that the victim's identification of him was questionable. We note that a victim's identification alone is sufficient to support a conviction. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The Appellant's complaints essentially concern the victim's credibility. It is well-established that determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). The jury heard and assessed the victim's testimony and determined that his identification of the Appellant was credible and reliable. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that a reasonable jury could have found beyond a reasonable doubt that the Appellant committed the aggravated robbery of the victim.

## III. Conclusion

Based on the foregoing, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE