FILED
01/17/2018
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 11, 2017

## STATE OF TENNESSEE v. JOSEPH HOWARD HINSON, III

**Appeal from the Circuit Court for Hardin County**
**No. 10013    C. Creed McGinley, Judge**
_____

### No. W2016-02161-CCA-R3-CD
_____

A Hardin County Circuit Court Jury convicted the Appellant, Joseph Howard Hinson, III, of selling .5 grams or more of methamphetamine within a drug-free zone, a Class B felony. The trial court sentenced the Appellant as a Range II, multiple offender to sixteen years in the Tennessee Department of Correction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

James Edward Williams, III, Savannah, Tennessee, for the Appellant, Joseph Howard Hinson, III.

Herbert H. Slatery III, Attorney General and Reporter; Breanne N. Hataway, Assistant Attorney General; Matthew F. Stowe, District Attorney General; and Vance Dennis, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The Hardin County Grand Jury returned an indictment charging the Appellant with selling .5 grams or more of methamphetamine within a drug-free zone after a confidential informant purchased drugs from the Appellant.

At trial, Hardin County Sheriff's Deputy Jason Caldwell, who was assigned to the 24th Judicial District Drug Task Force, testified that in August 2014, Tommy Woods

offered to work as a confidential informant by making purchases of illegal narcotics. Woods was paid $100 for each purchase.

On August 15, 2014, Woods called Deputy Caldwell and said that he believed he could buy methamphetamine from the Appellant. Deputy Caldwell and Investigator Johnny Alexander picked up Woods and drove him to the city park, which was located approximately 500 yards from the Appellant's apartment. Deputy Caldwell had Woods empty his pockets then did a pat-down around his waist and his socks. Deputy Caldwell acknowledged that he did not search around Woods's "crotch area." Deputy Caldwell found no illegal substances. Following the search, Deputy Caldwell equipped Woods with an audio/video recording device and gave him $150 to purchase approximately 1.5 grams of methamphetamine.

Afterward, Woods walked from the park to the Regency Apartments complex. He returned to the park approximately fifteen minutes later. Deputy Caldwell searched Woods again, and Woods gave him a bag containing a white powder substance. Woods did not return any money to Deputy Caldwell. Deputy Caldwell performed a preliminary test on a "speck" of the white powder and determined that the substance was methamphetamine. He said that the "preliminary weight was 1.5 grams, that was the way it came to me in the bag." Deputy Caldwell said that he took the audio/video recording device from Woods.

Deputy Caldwell said that he later gave the bag of white powder to his director, who inventoried it before sending it to the Tennessee Bureau of Investigation's (TBI) crime laboratory for testing.

On cross-examination, Deputy Caldwell testified that the Appellant lived on Stout Street, within 1,000 feet of the park. Deputy Caldwell said that he parked by the athletic building in the park and that his view of the Appellant's apartment was "obstructed."

Deputy Caldwell said that Woods had made one other purchase for the police. The search of Woods before and after the transaction took place in Deputy Caldwell's vehicle. Deputy Caldwell explained that he did not search Woods's "crotch area" because he was "not going to fondle [his] informant."

Deputy Caldwell acknowledged that the audio of the recording occasionally was "muffled." He further acknowledged that the video did not show any money changing hands, but he noted that Woods could be heard counting the money.

Deputy Caldwell explained that MSM was a white "joint compound" sometimes used to "cut" methamphetamine to "make more of what they've got." Woods did not have a bag when he left Deputy Caldwell's car but did have a bag when he returned.

Deputy Caldwell acknowledged the video showed that Woods walked past a person on his left when he came out of the Appellant's apartment door. Deputy Caldwell explained that the recording device was a cellular telephone that Woods held in his hand.

Hardin County Sheriff's Investigator Johnny Alexander testified that prior to the transaction, he and Deputy Caldwell picked up Woods from Woods's residence. He saw Deputy Caldwell perform a pat-down of Woods, and no illegal substances were found. Woods left to make the purchase, and the officers waited in the vehicle until Woods returned. At that time, Woods gave the narcotics to Deputy Caldwell, and Deputy Caldwell performed another pat-down of Woods.

On cross-examination, Investigator Alexander said that Woods was seated in Deputy Caldwell's vehicle at the time the pat-downs were conducted, and he acknowledged that "[w]e don't do just a full body strip down search on an informant." Investigator Alexander saw white powder in the clear, plastic bag Woods gave Deputy Caldwell.

Peter Hall, a special agent forensic scientist with the TBI's crime laboratory, testified he tested the substance that was inside the clear, plastic bag and determined that the substance was .94 grams of methamphetamine.

Tommy Woods testified that he contacted Deputy Caldwell about being a confidential informant. They agreed that Woods would make controlled purchases of methamphetamine and that Deputy Caldwell would pay Woods $100 for each purchase.

Woods said that one or two days prior to August 15, 2014, he suggested purchasing methamphetamine from the Appellant. On August 15, Deputy Caldwell drove to Woods's residence, picked up Woods, and drove him to the city park. Woods had not prearranged his visit to the Appellant's apartment and explained that it was "[j]ust a pop in. I knew he had some [drugs] before." Woods said that Deputy Caldwell searched him and found no contraband. The deputy then set up the cellular telephone so it would record the transaction and gave Woods the money to make the purchase.

Woods walked from the park to the Appellant's apartment. After he arrived, he asked the Appellant "if he had any methamphetamine to get rid of," and the Appellant responded, "[Y]eah, he had some." At that point, the State played the video recording of the transaction for the jury.[1] As the video played, Woods explained that he and the

---

[1]Although some of the audio on the recording is difficult to hear, our review of the recording reveals that Woods told the Appellant "he" gave Woods $150 for the transaction in the event the Appellant "had some extra." The Appellant said something indiscernible, and Woods said, "Just a hundred?" Woods counted out $100, and he said that he would "take this fifty back to him." Thereafter, Woods said, "There's a hundred," and again counted out $100. The recording did not show either

- 3 -

Appellant discussed the possibility of Woods buying more methamphetamine and that the Appellant told Woods to come back later. The Appellant asked Woods if he had a bag or another container in which to carry the drugs, and Woods responded that he did not. The Appellant put the methamphetamine in the corner of a sandwich bag. Woods explained that the video showed the Appellant "scraping [the methamphetamine] up with a razor and putting it inside the baggy." Woods estimated that he bought one gram of methamphetamine. Woods said that he gave the Appellant $100.

After the transaction was completed, Woods returned to Deputy Caldwell and gave him the drugs and the cellular telephone. Deputy Caldwell searched Woods then drove him home.

Woods acknowledged that he "used to be a heavy meth user" and that he had manufactured methamphetamine. He said that he was trying to change his life and had been "clean" for almost two years. He further acknowledged that he had misdemeanor charges pending at the time he purchased the methamphetamine from the Appellant, but he asserted that Deputy Caldwell did not help him with those charges and that his only reason for making the purchases was to be paid.

On cross-examination, Woods acknowledged that he had worked for Deputy Caldwell before and that he knew the areas of his body Deputy Caldwell would search. Woods acknowledged that the Appellant never mentioned the word "meth" or "methamphetamine" during the transaction. Woods said that "MSM" was "a pill used to cut drugs with" and denied that the Appellant gave him MSM. Woods conceded that he could be heard counting the money on the video but that the men are not shown on the video. He asserted that he gave the Appellant the money for the drugs. Woods said that after the transaction was complete, he walked back to Deputy Caldwell's vehicle. He did not stop along the way, but he may have said "hi or something" to someone he saw.

Woods acknowledged that he was arrested on July 27, 2014, and that he bought methamphetamine from the Appellant on August 15 while he was out on bond. Woods said that around that time, he was on eight counts of misdemeanor probation and that all of the counts except one were dismissed in November 2014. He explained that the dismissal was because his "lawyer was good," not because he made drug purchases for the police. Woods acknowledged that he had other misdemeanor convictions and that the sentences for those convictions were run concurrently. He did not think the sentence resulted from his work for the police, explaining that "[n]obody knew I was helping them except for [Deputy] Caldwell." Woods asserted, "I didn't ask for no help. I did all my time. I did what I was supposed to do."

occasion Woods counted the money. During the transaction, the camera shifted frequently, pointing at the walls, floor, or ceiling instead of at the Appellant or Woods.

The Appellant testified that in August 2015, he was living in his mother's apartment on Stout Street in Savannah. He acknowledged that he had "a drug problem" and that he had stolen items to support his drug habit. However, he asserted that he had never committed a violent offense and had never sold drugs.

The Appellant said that Woods was a "good friend," that they had known each other for approximately three years, and that they had used drugs together. The Appellant said that Woods contacted him and informed him of his plan to sell a man some MSM for $150 and pretend it was methamphetamine. The Appellant told Woods that he did not want to get involved because "that will get you killed." Woods was insistent and said he would stop by the Appellant's apartment to get some MSM.

When Woods came by the Appellant's apartment the next day, he told the Appellant that "the guy might be listening, that was his explanation for that phone." Woods told the Appellant that "[h]e was going to act like he was buying some dope." The Appellant said that he did not respond to anything Woods said because he had told Woods "I wasn't going to act like I was selling him meth, you know." The Appellant said that near the end of the transaction he asked Woods, "[Y]ou want some more of this?" The Appellant said that Woods responded, "[N]o, he needs drugs, he wants to buy drugs."

The Appellant said that Woods lied during his testimony, noting that he alternated between saying that he either gave the Appellant $150, $100, or $50. The Appellant denied receiving any money. The Appellant said that Woods counted the money out loud as part of his pretense of buying drugs. The Appellant said that Woods "produced a bag. . . . He didn't have no empty bag." The Appellant was shown the substance Woods gave Deputy Caldwell and said that it was not the same substance the Appellant gave Woods.

On cross-examination, the Appellant agreed that he had MSM in a bag, that he took out some of the substance, and that he cut it with a razor blade before putting it into a bag Woods had. The Appellant said that MSM was not an illegal substance, that it could be purchased at any health food store, and that it was "strange" Woods came to him to buy it. The Appellant admitted that he used methamphetamine and that he had committed burglaries and thefts to support his drug habit.

The jury convicted the Appellant of selling .5 grams or more of methamphetamine within 1,000 feet of a drug-free zone. The trial court sentenced the Appellant as a Range II, multiple offender to sixteen years in confinement. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

It is an offense for a defendant to knowingly sell methamphetamine. Tenn. Code Ann. § 39-17-434(a)(3). If the transaction occurs "within the prohibited zone of a preschool, childcare center, public library, recreational center or park," the offender is subject to an increased fine but not to an increased classification of offense. Tenn. Code Ann. § 39-17-432(b)(3). If the amount of methamphetamine is .5 grams or more, the offense is a Class B felony. Tenn. Code Ann. § 39-17-434(e)(1); 39-17-417(c)(1).

In the light most favorable to the State, the proof adduced at trial reveals that the Appellant sold .94 grams of methamphetamine to a confidential informant. The transaction occurred within 1,000 feet of a city park. Prior to the transaction, Deputy Caldwell searched Woods but found no contraband. Deputy Caldwell gave Woods $150 to make the purchase and a cellular telephone to record the transaction. Once at the Appellant's apartment, Woods gave the Appellant $100 and the Appellant gave him a white powder substance in a bag. Woods later gave the bag and the cellular telephone to Deputy Caldwell.

The Appellant's challenge to the sufficiency of the evidence is that Woods's testimony was inconsistent, misleading, and not credible. The Appellant maintains that

Woods had a reason to lie, noting that Woods had pending charges with which the State could assist, that he had charges that were dismissed, and that he received short, concurrent sentences on misdemeanor convictions. The Appellant also maintains that Deputy Caldwell did not search Woods properly and that Woods "had ample opportunity to make sure he had methamphetamine for [Deputy] Caldwell." This court repeatedly has asserted that determining the credibility of witnesses is "entrusted exclusively to the jury as the trier[ ] of fact." State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that the evidence adduced at trial was sufficient to sustain the Appellant's conviction.

### III. Conclusion

The trial court's judgment of conviction is affirmed.

_____
NORMA MCGEE OGLE, JUDGE