IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 15, 2018 Session

## STATE OF TENNESSEE v. KATRINA LYNETTE BROWN

**Appeal from the Circuit Court for Marshall County**
**No. 16-CR-99     Franklin Lee Russell, Judge**

_____

### No. M2017-02229-CCA-R3-CD

_____

After a bench trial, the Appellant, Katrina Lynette Brown, was found guilty of driving under the influence, violating the implied consent law, possessing .5 grams or more of cocaine with the intent to sell, possessing .5 grams or more of cocaine with the intent to deliver, and a brake light violation. The trial court merged the cocaine possession counts and imposed a total effective sentence of ten years, which was suspended to probation. On appeal, the Appellant contends that the evidence is not sufficient to sustain her conviction of possession of .5 grams or more of cocaine with the intent to sell. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Robert Dalton, Lewisburg, Tennessee (on appeal), and Michael Patrick Auffinger, Murfreesboro, Tennessee (at trial), for the Appellant, Katrina Lynnette Brown.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Robert J. Carter, District Attorney General; and Drew Wright and Joseph Clifford Johnson, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The Marshall County Grand Jury indicted the Appellant for driving under the influence (DUI), violating the implied consent law, possessing .5 grams or more of

cocaine with the intent to sell, possessing .5 grams or more of cocaine with the intent to deliver, and a brake light violation. The charges were the result of a traffic stop that occurred in the early morning of December 18, 2015.

Corporal Lonnie Cook with the Lewisburg Police Department testified that he had been trained in DUI detection. Around 12:50 a.m. on December 18, 2015, he was driving his patrol car on Water Street when he saw a white Hyundai turn onto Water Street from 2nd Avenue. The vehicle, which was traveling in the opposite direction from Corporal Cook, passed his patrol car then briefly stopped at a stop sign at the intersection of Water Street and 3rd Avenue. The intersection was eighty or one hundred feet from Corporal Cook's patrol car. Corporal Cook looked into his driver's side mirror and noticed that the brake light on the driver's side of the vehicle was not working.

Corporal Cook made a U-turn, activated his patrol car's blue lights, and pursued the vehicle. When the vehicle stopped, Corporal Cook approached, identified himself, and told the driver, who was the Appellant, the reason for the stop. Corporal Cook asked the Appellant for her driver's license and proof of insurance. The Appellant told Corporal Cook her name but said that she did not have a driver's license and that she thought it was suspended. She never provided proof of insurance. She asked Corporal Cook not to take her to jail and said that the car belonged to her boss, for whom she was running errands.

Corporal Cook said that during their conversation, he noticed the Appellant's eyes were bloodshot, and he smelled alcohol coming from either the Appellant or her vehicle. He asked the Appellant if she had consumed any alcohol that night, and she responded that "she had a few wine coolers" but that "she was fine."

Corporal Cook confirmed that the Appellant's driver's license had been suspended, and he learned that the Appellant had active warrants for her arrest. By that time, Officer Clint Newbill had arrived on the scene. Corporal Cook asked the Appellant to step outside and walk to the rear of the vehicle. When she complied, Corporal Cook noticed that she was very unsteady and had to hold on to the car for balance as she walked to the rear of the vehicle. As she walked by Corporal Cook, he smelled alcohol and a strong odor of marijuana. He asked the Appellant if she had any marijuana, and she responded that she did not use drugs. He thought the Appellant seemed nervous. Corporal Cook and Officer Newbill handcuffed the Appellant because of the active warrants and her nervousness.

Corporal Cook said that the Appellant did not follow his commands and that he had to repeat himself "multiple times." When Corporal Cook asked again if the Appellant had any marijuana, she responded, "Yes, it's in the glove compartment of the car." Officer Newbill went to the car to retrieve the marijuana. The Appellant then

- 2 -

turned and started to walk away from Corporal Cook. He had to order her to stop multiple times. Corporal Cook said that the Appellant's hands were cuffed behind her back. As she turned, she tilted her body to the right and reached underneath her shirt. Corporal Cook grabbed the Appellant's arms to stop her, and a pack of Newport cigarettes fell from her shirt. The Appellant said, "There it is, there it is, just take me to jail." Corporal Cook looked inside the pack and saw a yellow bag and a clear bag. The bags contained approximately 2.8 grams of marijuana and approximately 3.7 grams of crack cocaine, respectively. The officers searched the Appellant's car but found no drug paraphernalia.

Corporal Cook said that after Corporal Amanda Binkley arrived, she took the Appellant to jail. Corporal Cook later went to the jail, told the Appellant that he believed she was under the influence of an intoxicant, read the implied consent form to her, and asked her to perform field sobriety tests. The Appellant refused to perform the field sobriety tests or provide a blood sample. Corporal Cook stated that cash was found on the Appellant's person at the jail, but he did not state the amount.

Corporal Cook said that he charged the Appellant with driving on a suspended license, DUI, possession of a schedule II substance with the intent to sell, possession of a schedule VI substance, and violation of the implied consent law. He explained that he charged the Appellant with possession of a schedule II substance with the intent to sell because of the amount of crack cocaine in her possession and because no drug paraphernalia was found in her possession. Corporal Cook explained that a person possessing crack cocaine for personal use usually had a "crack pipe, a little glass pipe" for smoking the crack cocaine. He also noted that a person possessing crack cocaine for personal use typically had "just a little piece or two," but the Appellant possessed "quite a large amount."

On cross-examination, Corporal Cook acknowledged that an aluminum soda can could be used to smoke marijuana, "but they're usually bent and they've got holes punched in them and burn marks on them." When he searched the Appellant's vehicle, he did not find any scales, aluminum soda cans, or bags containing drugs.

Corporal Clint Newbill testified that on the evening of December 18, 2015, he assisted Corporal Cook on a traffic stop. When Corporal Newbill arrived at the scene, the Appellant was still in her vehicle, and Corporal Cook was following normal traffic stop procedures. Corporal Cook told Corporal Newbill that he had smelled marijuana. Corporal Newbill approached the vehicle and also smelled marijuana. He saw the Appellant exit her vehicle, but he was not paying attention for signs of impairment and noticed none. The Appellant acted "nervous," "shifty," and as if she wanted to walk away.

Corporal Newbill recalled that after the Appellant revealed she had marijuana in the glove box of her vehicle, she tried to put her hands inside her sweatshirt, and she "twist[ed] and turn[ed], and tr[ied] to walk off." Her actions made both officers nervous, and they decided to handcuff her. As she was being handcuffed, a cigarette pack fell from her sweatshirt onto the ground. Afterward, she seemed "defeated" and said "y'all have got me, there it is."

On cross-examination, Corporal Newbill said that he could not recall if he found any aluminum soda cans during the search of the car.

Officer Amanda Binkley testified that she was called to the scene to transport the Appellant to jail. During transport, Officer Binkley smelled alcohol on the Appellant. When Officer Binkley escorted the Appellant inside the building, the Appellant said, "My lawyer told me to say this, I do not consent; I do not consent."

Captain Scott Braden testified that on December 23, 2015, he transferred two small bags from the temporary police evidence storage locker to the long-term storage vault. One of the bags was made of clear plastic, and the other was made of brown paper. On June 24, 2016, at the request of Corporal Lonnie Cook, Captain Braden took the bags to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing. On January 3, 2017, after the testing was completed, he retrieved the bags from the TBI and returned the bags to the long-term evidence storage vault.

William B. Stanton, Jr., testified that he had worked as a special agent forensic scientist for the TBI before his recent retirement. He tested the substance found in the brown bag and the clear plastic bag. Testing revealed that the rock-like substance was 3.26 grams of cocaine-base, a schedule II controlled substance. The plant material was 2.55 grams of marijuana, a schedule VI controlled substance.

On cross-examination, he explained that cocaine base was known "on the street" as crack cocaine and that it was "an actual different form than the white powder" cocaine.

Timothy Lane, the director of the 17th Judicial District Drug Task Force, testified that he had specialized training concerning cocaine and was allowed to testify without objection as an expert in narcotics. Director Lane stated that in Marshall County, crack cocaine typically was sold in small "rocks" for amounts ranging from ten to one hundred dollars. Director Lane said that a person selling crack cocaine would want to "sell the smallest amount to maximize their profits" and would not necessarily possess a set of scales.

Director Lane explained that an "8 ball" of crack cocaine generally weighed 3.5 grams and had a street value of approximately $150 to $175. Director Lane said the

amount of cocaine recovered from the Appellant, 3.26 grams, was a quarter gram short of an 8 ball. Director Lane stated that the amount of drugs a person possessed could be an important consideration in determining whether the drugs were for personal use or for sale. He explained that crack cocaine could be sold by the "rock," with each rock weighing approximately .2 grams and selling for approximately $20. He stated that an 8 ball of crack cocaine was a large amount. Normally, a person possessing that amount of crack cocaine would break it into smaller rocks to sell, and it "could generate an income of $300."

Director Lane said that the presence or absence of drug paraphernalia was another factor to consider in determining whether the drugs were for personal use or sale. He explained that smoking was the most common way to use crack cocaine and that if a person possessed a "substantial quantity" of crack cocaine and did not have an item, such as a crack pipe, for personal use, he would "believe that they had the intent to distribute."

Director Lane said that he did not know of anyone possessing approximately an 8 ball of crack cocaine solely for personal use. He explained that most users of crack cocaine were "chronically addicted" and bought crack cocaine in small increments, often making multiple purchases in a single day. Director Lane said that most drug users did not have enough money to purchase an 8 ball of cocaine at one time for personal use.

Director Lane said that a person addicted to crack cocaine usually had difficulty maintaining employment and exhibited "physical changes." Director Lane said that a single person would not smoke an "entire 8 ball at once" because it likely would result in cardiac arrest. Director Lane reiterated that he thought if the Appellant possessed the crack cocaine for personal use, she would have had a crack pipe on her or in her vehicle.

On cross-examination, Director Lane said that he had never heard of crack cocaine being used as a "party drug." He knew that aluminum soda cans, glass vials, or car antennas were used to make crack pipes. He also knew that a person could put less than .1 gram of crack cocaine "in the end of a cigarette, and you could light it and smoke it that way."

The first defense witness, Karla Keiler, testified that she and the Appellant were cousins. Ms. Keiler said that on December 18, 2015, she was babysitting at a relative's residence on Park Street. The Appellant came to the residence, and the women drank alcohol, played Spades, and listened to music. Two or three hours later, around 9:00 or 10:00 p.m., the Appellant left with a friend, Kashus Randle. Ms. Keiler wanted to go with the Appellant, but the Appellant would not let her. The Appellant assured Ms. Keiler that she would return. Ms. Keiler thought the Appellant did not want Ms. Keiler to go with her because the Appellant knew that Ms. Keiler did not approve of her using drugs.

Ms. Keiler said that sometime around 11:00 p.m. or 12:00 a.m., the Appellant returned to the residence. Ms. Keiler noted that "something wasn't normal about" the Appellant and that she "couldn't be still." Ms. Keiler knew that the Appellant had a problem with drugs for many years and was concerned about her driving.

On cross-examination, Ms. Keiler said that the Appellant had been drinking Skol vodka "off and on" for two or three hours before she left the residence the first time. Ms. Keiler recalled that the Appellant had several drinks from a "big bottle" that was either half a gallon or a gallon.

Ms. Keiler said that when the Appellant returned, she did not say what she had been doing, but she looked and acted "really strange." Ms. Keiler said that the Appellant "was[] not so much as drunk as like she'd been doing drugs."

Rose Guillette testified that she and the Appellant were close friends. Ms. Guillette recalled that on December 18, 2015, she had been out of town for approximately one week. While she was gone, the Appellant did some errands for Ms. Guillette and used Ms. Guillette's car, which the Appellant was interested in buying. Ms. Guillette knew the Appellant had used crack cocaine. She had never seen the Appellant use drugs and thought the Appellant was a "hard worker," but she knew the Appellant had "sort of relapse[d]" and had "been in and out of rehab facilities."

On cross-examination, Ms. Guillette said that the Appellant told Ms. Guilette that she had been "partying with friends" on the night she was arrested. Ms. Guillette assumed that the Appellant meant she had been "doing drugs and drinking."

Mary Amato testified that she met the Appellant in the spring of 2013 through Ms. Guillette. After they became friends, the Appellant confided that she had a problem with crack cocaine. Ms. Amato did not know that the Appellant had been in a rehabilitation facility.

Ms. Amato said that she had a master's degree in counseling from Vanderbilt, that she had worked with teenagers who had drug problems, and that she had observed many Narcotics Anonymous and Alcoholics Anonymous "groups in the course of [her] studies." She had been around people, including her friends and family, who had used crack cocaine. She said that from her understanding of crack cocaine, an 8 ball was "generally just a one little baggie of drugs that's generally going to be used by one, maybe two, you know over the course of a night or weekend." She had "[a]bsolutely" heard of one person buying an 8 ball and consuming the entire amount in a couple of days. Ms. Amato was not aware of the Appellant being involved in selling drugs.

- 6 -

Cedric Delano Taylor, the Appellant's brother, testified that the Appellant got into trouble with drugs when she was sixteen years old and that she had the drug problem "on and off" for over twenty years. He had seen her use marijuana; however, if he saw her start to use other drugs, he usually went inside the house. He knew the Appellant had tried drug rehabilitation on two or three occasions.

On cross-examination, Mr. Taylor acknowledged that he was not with the Appellant on December 18 and that he had not given her money that night. He said that he had seen the Appellant use crack cocaine on at least two occasions and that she had smoked the crack cocaine in a pipe or a can. Mr. Taylor was not aware of the Appellant selling drugs.

Damian Brown, the Appellant's brother, testified that he knew the Appellant had problems with drugs and that she had been to drug rehabilitation two or three times. He thought her drug problems began when she was around nineteen years old, but he had never known her to sell drugs. He said he had seen her with drug paraphernalia, such as "roaches" and "cans."

On cross-examination, Mr. Brown acknowledged that he was not with the Appellant on December 18. Mr. Brown said that he had seen "little roaches or like a little can . . . in her house, something like a pop can." He did not know if she normally had drug paraphernalia in her possession at the same time she possessed crack cocaine.

The Appellant testified that she "spent some time" with Ms. Keiler on December 18 and then left with her friend, Kashus Reeder. The Appellant left her car at the residence, on Park Street, and Ms. Reeder drove them to the Appellant's house. When they arrived around 7:00 p.m., the Appellant's boyfriend, whom she identified as "Lamont Armstrong, Jimmy Armstrong," was there. Ms. Reeder had approximately two grams of crack cocaine, and all three smoked it using an aluminum soda can. The Appellant explained that in order to smoke crack cocaine from an aluminum soda can, she would "crush" the can in the middle, "poke" holes in the top of the can, and "sometimes" she poked holes in the sides. She would put ashes from previously smoked tobacco or marijuana inside the can to serve as a filter and place crack cocaine on top of the ashes. She would then heat the can with a lighter. She explained, "[T]he part you usually drink out of, that's the part you smoke out of."

The Appellant said that they ran out of crack cocaine around 10:00 p.m., and Ms. Reeder took the Appellant back to the residence on Park Street where she had been with Ms. Keiler. While they were there, the Appellant arranged to meet a man who was renting an apartment from Ms. Guillette. She needed to give him the keys to the apartment and get the first and last months' rent. The Appellant said that she did not get

paid until the following Friday and needed the money. The Appellant told Ms. Keiler that she was going home, and Ms. Keiler tried to stop her.

The Appellant left in her car, and Ms. Reeder followed in her vehicle. They went to a Walmart where the renter worked and waited in the parking lot. While she was waiting for the renter, she called a drug dealer and asked him to bring drugs to the parking lot. At approximately 11:15 p.m. or 11:20 p.m., the Appellant met with the renter and obtained the money. She did not say how much rent he paid but said it was "way more" than $150.

The Appellant said that before the drug dealer arrived, she and Ms. Reeder went inside Walmart "to waste some time." They got two cans of soda from a vending machine so each could have a can to smoke crack cocaine. Ms. Reeder took one can with her, and the Appellant put the other can in her car. The drug dealer arrived over an hour after the renter left, and the Appellant used $150 of the rent money to pay for the crack cocaine. The Appellant and Ms. Reeder then drove toward the Appellant's house.

The Appellant said that as she was driving home, she decided to drive by the apartment to see if the renter had any problems. During the drive, she was pulled over by the police. The Appellant acknowledged that she had marijuana and crack cocaine in her possession and maintained that she had intended to go home and use the drugs.

On cross-examination, the Appellant said that she thought she had bought an entire 8 ball of crack cocaine. The Appellant acknowledged that she told the police she was running errands for her boss, Rob Dalton. The Appellant said that Mr. Dalton and Ms. Guillette were married, and she thought the car was in Mr. Dalton's name. The Appellant acknowledged that she had been drinking alcohol earlier that night but maintained that she had mostly been "smoking dope."

The Appellant said that the money the police found on her was the remainder of the rent money. The Appellant said that she recently had lost her job due to a temporary lay-off but that she was due one more paycheck and intended to use that money to pay Ms. Guillette. The Appellant said that she, Mr. Armstrong, and Ms. Reeder had smoked two grams of crack cocaine in just two hours and that she did not think the 3.26 grams of crack cocaine she purchased would "last long." Regarding the marijuana, the Appellant thought she had taken it from Ms. Reeder. The Appellant did not recall refusing to take field sobriety tests or a blood test.

At the conclusion of the bench trial, the trial court found the Appellant guilty of DUI, violating the implied consent law, possessing .5 grams or more of cocaine with the intent to sell, possessing .5 grams or more of cocaine with the intent to deliver, and a brake light violation. The trial court merged the cocaine convictions and imposed a total

effective sentence of ten years, which was suspended to probation. On appeal, the Appellant challenges the sufficiency of the evidence sustaining her conviction for possession of .5 grams or more of cocaine with the intent to sell. She does not dispute that she was in possession of the cocaine but contends that the State's proof was not sufficient to support the inference that she possessed the drugs with the intent to sell.

## II. Analysis

On appeal, a conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the findings of the trier of fact. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to sustain the Appellant's conviction, the State was required to prove that she knowingly possessed .5 grams or more of cocaine with the intent to sell. Tenn. Code Ann. §§ 39-17-417(a)(4), (c)(1). Our supreme court has stated that "intent can rarely be shown by direct proof and must, necessarily, be shown by circumstantial evidence." Hall v. State, 490 S.W.2d 495, 496 (Tenn. 1973). Notably, Tennessee Code Annotated section 39-17-419 provides that "[i]t may be inferred from the amount of a controlled substance . . . , along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing."

On appeal, the Appellant relies on State v. Belew, 348 S.W.3d 186, 191 (Tenn. Crim. App. 2005), in which this court held that a trier of fact may not infer intent based

solely on the amount of the controlled substance but also must consider other relevant facts surrounding the arrest. The Appellant contends that the State adduced no facts other than the amount of crack cocaine to support the inference that the Appellant possessed the drugs with the intent to sell. Thus, the proof was insufficient to sustain the conviction. The State responds that Belew is distinguishable from the instant case because "other relevant facts surrounding the arrest" supported the Appellant's conviction for possession with the intent to sell. We agree with the State.

In the light most favorable to the State, the proof at trial revealed that at the time of the Appellant's arrest, a clear plastic bag containing 3.26 grams of crack cocaine and a brown bag containing 2.25 grams of marijuana were found inside a pack of cigarettes that fell from her shirt. A search of the Appellant and her vehicle revealed that the Appellant had no drug paraphernalia, such as a crack pipe or an aluminum soda can, to smoke the crack cocaine. The Appellant admitted that she spent $150 of the rent money to purchase the crack cocaine. Several officers, including Director Lane of the drug task force, testified that the amount of crack cocaine possessed by the Appellant was too large for personal use and noted that the Appellant did not have any drug paraphernalia for smoking the crack cocaine in her possession. Director Lane testified in detail regarding why the amount of crack cocaine in the Appellant's possession generally was not an amount for personal use. He also noted that the street value of the crack cocaine was $150 to $175, but an 8 ball usually was broken apart and "could generate an income of $300."

We note that determining the credibility of witnesses is within the purview of the trier of fact. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). In the instant case, the trial court, as the trier of fact, clearly resolved the issue of credibility in the State's favor. We may not now reconsider the credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). The State presented sufficient facts surrounding the arrest to allow the trial court to infer that the Appellant possessed .5 grams or more of crack cocaine with the intent to sell. See Belew, 348 S.W.3d at 191; State v. Steven Kelly, No. M2018-00659-CCA-R3-CD, 2019 WL 920361, at *4 (Tenn. Crim. App. at Nashville, Feb. 25, 2019), perm. to appeal denied, (Tenn., Apr. 11, 2019).

### III. Conclusion

The judgment of the trial court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE

- 10 -